**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAGDALENA KULISZ and SHAHAR KENAN,
 individually and d/b/a MISS IMMIGRANT USA,
 a civic, cultural, and immigrant-identity initiative,
 and on behalf of all others similarly situated,
        Plaintiffs,

v.

THE CITY OF NEW YORK;
 NEW YORK CITY HUMAN RESOURCES ADMINISTRATION, by and through its ADULT
PROTECTIVE SERVICES ("APS") PROGRAM;
 NEW YORK STATE UNIFIED COURT SYSTEM;
 NEW YORK STATE OFFICE OF COURT ADMINISTRATION;
 HON. JOSEPH ZAYAS, in his official capacity as Chief Administrative Judge of the Courts of
New York State;
 HON. DANIELLE CHINEA, in her official capacity as a Housing Court Judge of the Civil
Court of the City of New York, New York County;
 JOHN/JANE DOE ADA COORDINATORS 1–10;
 JOHN/JANE DOE APS SUPERVISORS 1–10;
 JOHN/JANE DOE COURT CLERKS AND ADMINISTRATORS 1–10;
        Defendants.

Case No.: _____


# CLASS ACTION COMPLAINT

# FOR DECLARATORY AND INJUNCTIVE RELIEF

(ADA Title II; ADA Title V; Rehabilitation Act § 504;

42 U.S.C. § 1983; Fourteenth Amendment)


PRELIMINARY STATEMENT

1.      Plaintiffs bring this action with deep respect for the role courts play in a constitutional democracy. Plaintiffs' broader civic work—including their federal civil-rights action against an elected official, their advocacy for immigrant identity through Miss Immigrant USA, and their challenges to municipal and media misconduct—has always proceeded on the premise that disputes over rights and power must be resolved in court, not in the streets. Plaintiffs therefore turned, in good faith, to the New York State courts as the very institutions charged with enforcing the Constitution and federal civil-rights laws. The injuries alleged here do not arise from disagreement with a particular ruling, but from structural practices and omissions within the judicial and APS systems that, in operation, deny disabled litigants meaningful access to those courts. By seeking prospective, structural relief under Ex parte Young to bring the judicial branch's administrative and ADA practices into compliance with federal law, Plaintiffs do not seek to weaken the judiciary, but to ensure that it remains open, lawful, and accessible to the very communities—disabled, immigrant, and pro se—whose rights it is sworn to protect.

2.      This federal civil-rights class action challenges systemic and ongoing violations of Title II and Title V of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("RA"), and the Fourteenth Amendment, arising from entrenched, unlawful, and discriminatory practices of the New York City Housing Court and New York City Adult Protective Services ("APS"). These practices routinely deny disabled tenants meaningful access to eviction proceedings, resulting in wrongful defaults, inquests, and eviction warrants entered while formal ADA accommodation requests remain pending, ignored, misplaced, or mishandled. This Complaint is supported by contemporaneous documentary, audio, video, and testimonial evidence—including a transcript of Plaintiffs' December 11, 2025 telephone call with the Housing Court ADA Designee and the ADA office's same-day written response—demonstrating

that ADA requests are in fact received at the administrative level but are never meaningfully processed, docketed, or brought to the attention of the presiding judge before inquests and judgments are entered.

3.    Plaintiffs Magdalena Kulisz and Shahar Kenan are disabled New Yorkers and co-founders of Miss Immigrant USA, a civic and cultural initiative dedicated to immigrant identity, community leadership, and public advocacy. Since late 2024, Plaintiffs have been targeted with politically charged harassment, reputational attacks, threats, and retaliatory pressures connected to their civic mission and protected speech, and these events have significantly exacerbated their psychiatric and medical disabilities, forcing them to litigate multiple civil and administrative matters from their home ofice while managing substantial functional impairment. The Lerch & Tapper Housing Court matter is one such proceeding, arising in the wake of Plaintiffs' federal civil-rights action against an elected official and their public defense of immigrant identity and democratic participation, in which Plaintiffs' disabilities—exacerbated by that retaliatory climate—combined with the institutional failures alleged herein to culminate in an inquest and judgment of possession entered in their absence, notwithstanding their earlier ADA submissions and requests for remote participation.

4.    Plaintiffs' ADA and access-to-justice claims arise against a broader civic background. In 2025, Plaintiffs brought a federal civil-rights action challenging retaliation by an elected official, publicly defended immigrant identity and democratic norms through Miss Immigrant USA, and pursued claims against municipal agencies and media actors that, in their view, had violated core constitutional and statutory protections. Plaintiffs did not seek to fight these battles in the streets; they turned, in good faith, to the very courts and institutions that the Constitution presupposes as channels for peaceful redress. What they encountered instead, across multiple proceedings, was

not a single "bad actor," but a recurring pattern of structural non-response: ADA requests that vanished into administrative voids, agencies that generated materially inaccurate reports, and courts that proceeded as though no barriers existed. The Lerch & Tapper Housing Court matter is one concrete example of this pattern, where disability-based barriers to participation were converted into grounds for default, eviction, and the practical denial of appellate review.

5.      Housing Court officials knew or should have known of Plaintiffs' disabilities, trauma, medical limitations, and prior federal civil-rights litigation. Plaintiffs filed a formal ADA Accommodation Request, emailed ADA Coordinators, submitted letters detailing their conditions, and filed multiple NYSCEF documents referencing ADA barriers. Under Title II and longstanding federal precedent, this actual and constructive knowledge triggered a heightened duty of diligence, inquiry, and ADA compliance by Housing Court officials, including an obligation to verify the status of ADA requests before treating a disabled litigant's nonappearance as a default. Instead, the Court displayed disregard and indifference, choosing procedural expediency over federal law and disabled litigants' rights. On December 11, 2025, the Housing Court ADA Designee expressly confirmed by telephone that Plaintiffs' September 15, 2025 ADA Accommodation Request had been received, yet also revealed that no accommodations had been implemented and that an inquest and judgment of possession had already been entered without any written ADA determination or meaningful interactive process. The ADA office's same-day email response likewise failed to address Plaintiffs' requested accommodations for court access, focused narrowly on APS logistics, disclaimed responsibility for providing virtual access in connection with APS, and forwarded only a generic Order to Show Cause template rather than engaging with or adjudicating the substance of Plaintiffs' ADA rights.

6.    Despite multiple ADA submissions and court-record documentation showing their existence, Housing Court officials

(a) failed to log, track, or process Plaintiffs' ADA requests

(b) refused remote-appearance accommodations essential to Plaintiffs' disabilities

(c) issued no written determination on any ADA request

(d) referred Plaintiffs to APS in lieu of engaging in the legally required ADA interactive process

(e) accepted APS's false assertion that Plaintiffs "could not be located," despite evidence to the contrary and

(f) entered default, conducted an inquest, and issued an eviction warrant while ADA requests remained pending and unresolved.

7.    In addition, Housing Court clerks and administrators failed to ensure that Plaintiffs' ADA submissions were reflected on the docket, brought to the attention of Judge Chinea, or considered before scheduling or conducting the inquest; ADA personnel misinformed Plaintiffs that accommodations could not be processed without a future court date, even though it was the absence of accommodations that contributed to Plaintiffs' nonappearance; and, after the inquest had already occurred, the ADA office attempted to retroactively cure its failure by sending Plaintiffs a generic "Affirmation in Support of OSC – Vacate Inquest Judgment" form instead of issuing an individualized ADA determination or recommending that the judgment be revisited in light of the unprocessed ADA request.

8.    These failures constitute violations of the ADA, the RA, and the Fourteenth Amendment's Due Process Clause. They also directly impaired Plaintiffs' ability to continue their civic work through Miss Immigrant USA, threatened their health and safety, destabilized

5

their housing, and obstructed their capacity to litigate existing federal civil-rights actions stemming from their immigrant-identity advocacy. By converting Plaintiffs' disabilities and accommodation requests into a basis for procedural forfeiture and adverse inferences, rather than a trigger for reasonable modification and enhanced diligence, Defendants weaponized state processes against disabled, politically active tenants in precisely the manner that Congress sought to prohibit in enacting Title II and Title V of the ADA.

9.      Opposing counsel had actual notice of Plaintiffs' ADA requests, disability barriers, and written submissions. Counsel nevertheless remained silent at critical junctures—allowing the Court to proceed under the false assumption that no ADA requests existed. Such silence violated counsel's duties of candor toward the tribunal and fairness to disabled litigants under 22 N.Y.C.R.R. § 1200, and materially contributed to the unconstitutional deprivation of Plaintiffs' rights. Opposing counsel received service of papers explicitly referencing Plaintiffs' ADA accommodation request, APS-related trauma, and requests for remote participation, yet never alerted the Court when proceedings went forward in Plaintiffs' absence and, instead, affirmatively sought default and inquest relief, thereby acquiescing in—and benefiting from—the institutional suppression and mishandling of Plaintiffs' ADA filings.

10.     Upon information and belief, Plaintiffs' experience reflects a broader pattern in the New York City Housing Court system, where numerous disabled litigants encounter lost ADA filings, ignored accommodation requests, unreliable clerical systems, and APS reports accepted without scrutiny. These structural failures closely mirror those condemned in Blatch v. Franco, 1998 WL 265132 (S.D.N.Y. 1998), in which the Court certified a class and imposed system-wide equitable relief after finding pervasive discrimination against disabled tenants in eviction matters. These recurring failures are not isolated mistakes but operate as de facto policies, customs, and

practices of the City of New York and the Unified Court System, supporting municipal liability

under Monell v. Department of Social Services, 436 U.S. 658 (1978), and class-wide relief under

Fed. R. Civ. P. 23(b)(2). The Housing Court ADA office's written refusal to provide virtual

access in connection with APS, its failure to address court-access accommodations at all, and its

belated, follow-up–triggered response after judgment that consisted only of sending generic OSC

templates and procedural instructions instead of adjudicating Plaintiffs' ADA request, are

emblematic of system-wide customs that substitute post hoc damage control for the proactive,

front-end accommodations required by federal law.

11.    Upon information and belief, since approximately August 2025, Plaintiffs have submitted

numerous ADA accommodation requests and Poor Person (IFP) applications in Supreme Court,

Civil Court, Small Claims Court, Housing Court, and other New York State proceedings. To

date, and upon information and belief, no ADA Coordinator or Clerk's Office in those courts has

issued any written ADA determination, acknowledgment, or response, with the sole exception of

the Southern District of New York, which granted Plaintiffs' IFP status in a related federal

civil-rights matter. This widespread non-responsiveness demonstrates a systemic breakdown in

the Unified Court System's ADA and access-to-justice procedures, rather than an isolated

Housing Court error. The contrast between SDNY's prompt, written adjudication of Plaintiffs'

IFP and accommodation-related submissions and the state courts' pattern of silence underscores

that the problem lies not in Plaintiffs' credibility or documentation, but in the New York State

court system's failure to operationalize and enforce its own ADA policies in practice.

12.    Plaintiffs seek class-wide declaratory and injunctive relief requiring Defendants to

implement lawful, ADA-compliant procedures, including

  (a) mandatory ADA request logging and tracking systems

(b) written determinations before any default, inquest, or eviction warrant

(c) guaranteed remote access for qualified disabled litigants

(d) prohibition on defaults or eviction warrants while ADA requests remain pending

(e) disability-appropriate APS investigative protocols

(f) comprehensive ADA/RA training for Housing Court and APS staff and

(g) monitoring, reporting, and compliance mechanisms modeled on Blatch.

13.     Plaintiffs further seek injunctive relief requiring that: (h) all ADA accommodation requests be promptly scanned, assigned a unique tracking identifier, and docketed in the underlying case with automatic notice to the presiding judge; (i) ADA Coordinators provide timely, written grants or denials specifying the reasons for any limitation or refusal of accommodations; and (j) Housing Court and APS adopt joint protocols ensuring that APS referrals do not supplant, delay, or extinguish ADA rights, and that APS reports are not relied upon to justify adverse actions where ADA requests remain pending or unresolved.

14.     Plaintiffs seek only prospective declaratory and injunctive relief against state officials under Ex parte Young, 209 U.S. 123 (1908). Plaintiffs do not seek damages from the New York State Unified Court System, the Office of Court Administration, or Judges Zayas and Chinea. This Complaint is therefore not barred by the Eleventh Amendment, consistent with Edelman v. Jordan, 415 U.S. 651 (1974), and Will v. Michigan Department of State Police, 491 U.S. 58 (1989). Plaintiffs do not seek reversal, vacatur, or modification of any individual Housing Court judgment, but instead challenge ongoing systemic practices and policies that independently violate federal law, thereby avoiding the limitations of the Rooker–Feldman and Younger doctrines. Plaintiffs do, however, seek damages, fees, and costs from municipal and non-immune defendants, including the City of New York and its agencies, for injuries proximately caused by

the policies, customs, and practices alleged herein, consistent with Monell and 42 U.S.C. §§ 1983 and 1988.

15.     Plaintiffs further seek leave to proceed in forma pauperis and ADA accommodations in this federal action. Plaintiffs' disabilities and financial hardship have already been recognized by this Court in a related federal civil-rights matter in which their in forma pauperis motion was granted. This prior ruling confirms that Plaintiffs are indigent and that they cannot safely travel, appear in person, or litigate without accommodations—needs that Housing Court unlawfully disregarded despite Plaintiffs' repeated requests. Plaintiffs accordingly request that all conferences in this action be conducted by remote means, that deadlines be reasonably tailored to their disabilities, and that all written communications from the Court and opposing parties clearly identify any actions required of Plaintiffs so that their participation in this systemic challenge is not obstructed by the very barriers they seek to remedy.

## HOUSING COURT FACTUAL BACKGROUND

 (Heightened Judicial Duty + Actual/Constructive Knowledge + ADA Violations)

16.     At all relevant times, Housing Court had actual and constructive knowledge of Plaintiffs' disabilities, trauma, medical limitations, their need for remote-appearance accommodations, and (upon information and belief) their ongoing federal civil-rights litigation. Plaintiffs expressly disclosed these conditions in their formal ADA accommodation request, in NYSCEF filings, in medical-necessity letters, and in written motions. On September 15, 2025, Plaintiffs emailed a completed ADA Accommodation Request Form and detailed narrative request to the Housing Court ADA email address, expressly tying their disabilities to the need for written and remote communication, and requesting that the accommodation be processed, docketed, and brought to

the attention of the presiding judge. The NYSCEF docket for Lerch & Tapper v. Kulisz & Kenan (Index No. 307838-25/NY) independently confirms that these ADA-related filings and references were visible, accessible, and repeatedly made part of the record before the December 8, 2025 inquest. On December 11, 2025, the Housing Court ADA Designee expressly confirmed by telephone that the September 15 ADA request had been received, and only after Plaintiffs initiated that follow-up call did the ADA office send an email attaching prior orders and a generic "Affirmation in Support of OSC – Vacate Inquest Judgment," while still failing to issue any written determination on the ADA request or to acknowledge or address Plaintiffs' request for remote court access.

17.     Under Title II of the ADA, Section 504, and the Due Process Clause, this knowledge imposed a heightened, affirmative duty on Housing Court to:

 (a) ensure meaningful access for disabled litigants;

 (b) verify the existence and status of ADA accommodation requests;

 (c) avoid adverse adjudication while ADA issues remained unresolved;

 (d) prevent foreseeable harm resulting from disability-related barriers; and

 (e) refrain from treating disability-based nonappearance as willful misconduct.

18.     Despite this heightened legal duty—not a discretionary courtesy but a mandate grounded in Tennessee v. Lane, 541 U.S. 509 (2004); Henrietta D. v. Bloomberg, 331 F.3d 261 (2d Cir. 2003); and Greene v. Lindsey, 456 U.S. 444 (1982)—Judge Chinea engaged in conduct that foreseeably and unlawfully deprived Plaintiffs of their rights. Specifically, the Court:

 (a) treated disability-based inability to appear as a willful default, contrary to ADA and due-process principles requiring reasonable modification of appearance requirements;

 (b) denied Plaintiffs' motions solely because they could not appear in person, despite written

notice of disability limitations and despite Plaintiffs' pending ADA request;

 (c) failed to acknowledge ADA filings plainly visible on the NYSCEF docket, constituting bureaucratic indifference prohibited under Title II of the ADA;

 (d) conducted only a superficial verbal inquiry into ADA records rather than reviewing the docket, requesting the written ADA log, consulting the ADA Coordinator, or examining Plaintiffs' submitted materials;

 (e) relied on APS misstatements—including the false claim that Plaintiffs "could not be located"—even though these statements were contradicted by Plaintiffs' direct communications and video and email evidence;

 (f) ignored Plaintiffs' letters, medical submissions, and accommodation requests, including multiple filings describing their inability to travel due to documented medical and psychiatric disabilities; and

 (g) proceeded to enter a default, conduct an inquest, and issue an eviction warrant while Plaintiffs' ADA requests remained pending, unprocessed, and unaddressed. Upon information and belief, Housing Court clerks and ADA staff also failed to transmit Plaintiffs' September 15, 2025 ADA request to Judge Chinea, failed to ensure that the request was reflected in any ADA log or case-management entry accessible to the Court, and later attempted to shift responsibility back onto Plaintiffs by providing only an OSC form after judgment had already been entered, rather than acknowledging that the inquest and judgment had proceeded in the shadow of an unresolved, unadjudicated ADA request.

19.    In addition, Plaintiffs attempted to file a Notice of Appeal with a Poor Person fee-waiver application and an ADA request exempting them from in-person appearances. Housing Court staff acknowledged that Plaintiffs' fee-waiver request had been granted, yet the Court

nevertheless instructed Plaintiffs that they were required to appear in person to file the Notice of

Appeal. Because Plaintiffs had an active ADA accommodation requesting exemption from

in-person appearances, they were unable to appear, and the Court refused to accept the

electronically submitted Notice of Appeal. Plaintiffs' detailed cover letter explaining their ADA

request, attaching the Notice of Appeal, and requesting electronic filing received no response.

The ADA office's December 11, 2025 email, which ignored Plaintiffs' request for remote access

and instead provided only a post-judgment OSC template, confirms that state actors were aware

of Plaintiffs' disability-related barriers yet persisted in conditioning appellate access on the very

in-person appearances Plaintiffs sought to avoid for medical reasons. This denial of appellate

access—caused solely by the Court's refusal to honor Plaintiffs' ADA request—constitutes an

additional, independent violation of the ADA, Section 504, and the constitutional right of access

to courts. See, e.g., Bounds v. Smith, 430 U.S. 817, 828 (1977) (access to courts includes a

meaningful opportunity to present claims); Tennessee v. Lane, 541 U.S. 509 (2004).

20.     These actions collectively violated Plaintiffs' rights under Title II of the ADA, Section

504 of the Rehabilitation Act, and the Fourteenth Amendment, and they exemplify the systemic

practices through which disabled tenants are deprived of meaningful access to Housing Court

proceedings. The combination of (i) received but unprocessed ADA emails, (ii) ADA staff who

admit receipt only after judgment and then respond with generic OSC templates, and (iii) judicial

reliance on APS misstatements while ignoring docketed ADA filings, reveals not an isolated

oversight but a repeatable pattern embedded in the way Housing Court handles disabled litigants'

cases.

21.     Plaintiffs do not seek review, reversal, or nullification of any Housing Court judgment in

violation of the Rooker–Feldman doctrine. See District of Columbia Court of Appeals v.

Feldman, 460 U.S. 462 (1983). Rather, Plaintiffs challenge independent, collateral federal violations—including the failure to process ADA requests, the refusal to honor disability accommodations, reliance on inaccurate APS reports, and systemic barriers embedded in court operations. The relief sought is forward-looking, structural, and consistent with Hoblock v. Albany County Bd. of Elections, 422 F.3d 77 (2d Cir. 2005), and falls squarely within the doctrine of Ex parte Young, permitting injunctive and declaratory relief to remedy ongoing violations of federal law. Any discussion of the Lerch & Tapper inquest and judgment is offered solely as factual context illustrating these systemic ADA failures, not as an invitation to this Court to sit in appellate review of a state-court judgment.

22.     As a direct and foreseeable consequence of these ADA and procedural failures, Judge Chinea repeatedly imposed drastic, case-dispositive sanctions on Plaintiffs that flowed directly from disability-based barriers rather than from any willful misconduct. First, the Court denied and dismissed Plaintiffs' motion to stay and related relief solely because Plaintiffs were unable to appear in person, even though their nonappearance was the product of documented psychiatric and medical limitations and a pending ADA accommodation request seeking remote participation. Second, on December 8, 2025, the Court proceeded to inquest and entered a judgment of possession and warrant of eviction against Plaintiffs in their absence, treating disability-based nonappearance—compounded by APS's "unable to locate" misrepresentation—as if it were a voluntary default, without ever resolving Plaintiffs' ADA request or providing a reasonable modification of appearance requirements. Third, when Plaintiffs attempted to file a Notice of Appeal accompanied by a Poor Person fee-waiver application and an ADA request for exemption from in-person filing, Housing Court staff, acting under the Court's authority, refused to accept the electronically submitted Notice of Appeal and

insisted on an in-person appearance that Plaintiffs were medically unable to provide, thereby effectively blocking Plaintiffs from initiating appellate review. Collectively, these actions converted Plaintiffs' disabilities and their requests for accommodation into the very grounds for denying a stay, ordering eviction, and foreclosing appeal, in violation of Title II of the ADA, Section 504, and the constitutional guarantees of due process and access to the courts.

**APS MISCONDUCT**

(False Reporting + Disability Mismanagement + Judicial Reliance + Constitutional Impact)

23.     APS played a central role in the deprivation of Plaintiffs' rights by submitting an "unable to locate" report that was materially inaccurate, factually implausible, and inconsistent with APS's own prior contact with Plaintiffs. Specifically, APS (a) spoke directly with Plaintiff Kenan in person during a home visit—an interaction captured on video in which the worker acknowledged his identity and the purpose of the visit, (b) received written email responses from Plaintiffs, including disability-based instructions requesting written-only communication due to medical limitations, (c) had actual notice that Plaintiffs could not safely engage in in-person interviews yet failed to offer any accommodation or alternative method consistent with ADA requirements, and (d) never indicated that communication was unsuccessful, never followed up, and made no effort to reschedule or coordinate a disability-appropriate alternative evaluation. Upon information and belief, APS was also on constructive notice of Plaintiffs' disabilities and accommodation needs through the Housing Court's referral, Plaintiffs' written submissions, and the ADA Accommodation Request transmitted to the courts, all of which described the same mental-health and medical limitations that required written and remote communication. In light of Plaintiffs' pending ADA request and repeated written notices to APS, the APS worker should

not have appeared in person at Plaintiffs' home at all; by deliberately choosing an in-person visit that conflicted with Plaintiffs' requested accommodation, APS set the stage for the later false narrative that Plaintiffs were "uncooperative" or "unavailable."

24.     In addition to ignoring Plaintiffs' written request that APS refrain from in-person visits and communicate only in writing or by remote means, APS mailed Plaintiffs a scheduling letter stating that an APS worker would come to their home on specified dates and within fixed time windows, but the letter did not provide any telephone number or email address by which Plaintiffs could confirm availability, request an accommodation, or propose an alternative time. The letter was framed as a one-directional command—"we will be there and you must be home"—rather than an invitation to engage in a reasonable, disability-sensitive process. Although Plaintiffs had previously asked APS not to come in person at all, once they received the scheduling notice they nevertheless prepared to cooperate to avoid being labeled noncompliant: they remained at home during the stated window, prepared to photograph and record the interaction, and printed a letter to hand-deliver to the APS worker documenting their prior ADA and written-only requests. On the scheduled date, an APS worker—believed, based on the scheduling notice, to be the assigned caseworker—rang the bell; by the time Plaintiffs reached the door, however, the worker had already left, without leaving a card, note, or any means of contact. APS later treated this brief appearance and immediate departure as further support for its "unable to locate" conclusion, even though Plaintiffs were in fact home, waiting, and attempting to engage on terms consistent with their disabilities.

25.     Despite these facts, APS formally notified Housing Court that it was "unable to locate" Plaintiffs, thereby creating an inaccurate, misleading, and discriminatory record. That report (a) ignored Plaintiffs' disability-based communications, (b) mischaracterized direct APS contact as "unable to locate," (c) failed to acknowledge written communications already in APS's possession, (d) violated the ADA's requirement of individualized assessment and good-faith engagement with disabled individuals, and (e) resembled the kind of materially inaccurate or knowingly false government reporting that the Second Circuit has recognized as actionable under Southerland v. City of New York, 680 F.3d 127 (2d Cir. 2012). APS's failure to propose or implement any written, telephone, or remote assessment—despite knowing, or at minimum having clear reason to know, that Plaintiffs' disabilities made in-person contact unsafe and destabilizing—further demonstrates deliberate indifference to federally protected rights rather than mere negligence. By closing Plaintiffs' APS case on the ground that APS was "unable to locate" them, after having physically visited their home, spoken with Mr. Kenan at the gate, and corresponded by email, APS converted Plaintiffs' assertion of ADA rights and refusal of in-person visits into a pretextual basis for denying services and supplying Housing Court with a false account of the facts.

26.     Housing Court relied on APS's inaccurate report without verification, without comparing it to Plaintiffs' filings, and without reviewing available evidence. This uncritical reliance materially influenced the Court's decisions to deny motions, schedule an inquest, treat Plaintiffs as absent or unreachable, and issue an eviction warrant. When Plaintiffs later contacted the Housing Court ADA office, the ADA Designee confirmed that APS had reported Plaintiffs as "unable to be located," even though APS had previously visited Plaintiffs' home, spoken with

Mr. Kenan, and received written communications—facts that were never disclosed to or reconciled by the Court. In effect, APS's misrepresentation and the Court's unquestioning acceptance of it created a closed informational loop in which Plaintiffs' disabilities and accommodation requests were erased from the operative narrative and replaced with a false story of non-participation.

27.     APS's misconduct, together with Housing Court's reliance on false and incomplete information, created a constitutionally defective process that deprived Plaintiffs of meaningful access to court, a fair hearing, accurate factual determinations, and due process rights guaranteed under the Fourteenth Amendment. The federal claims asserted here challenge those independent, collateral violations of federal law—not the correctness of any state-court judgment itself. By allowing an unverified "unable to locate" notation to substitute for a genuine, disability-sensitive investigation, APS and Housing Court jointly transformed Plaintiffs' disabilities and accommodation requests into a basis for adverse action, in direct conflict with the ADA's core mandate of equal access. The resulting inquest and warrant thus rest not on neutral fact-finding, but on a chain of decisions infected at each stage by disregard of Plaintiffs' disabilities and by demonstrably false APS reporting.

28.     Younger abstention does not bar this action. To the extent the Housing Court matter is deemed no longer "ongoing" after the entry of default, inquest, and warrant of eviction, Younger v. Harris, 401 U.S. 37 (1971), by its terms does not apply. Even if some aspect of the Housing Court proceeding were viewed as ongoing, the state forum is not an adequate vehicle for resolving Plaintiffs' federal ADA and constitutional claims, given the Court's refusal to process ADA filings and to honor disability-based access requests, and the circumstances described

herein rise to the level of bad faith and extraordinary circumstances recognized as exceptions to Younger and Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982). Plaintiffs seek prospective, structural relief to remedy these ongoing federal violations, which is squarely within this Court's authority. The ADA office's December 11, 2025 email—stating that it "does not provide ADA Virtual Appearances to APS" and offering only a generic OSC form after judgment—further confirms that state actors are using procedural devices to insulate APS's misconduct rather than to correct it, reinforcing the need for federal intervention. Taken together, APS's false reporting and the ADA office's refusal to substantively engage with Plaintiffs' accommodation request show an entrenched practice of prioritizing administrative convenience and agency insulation over compliance with federal disability law.

29.     Upon information and belief, APS's conduct in this matter is consistent with a broader, persistent pattern in which APS issues "unable to locate" determinations without adequate verification, fails to respond to written communications, and disregards disability-based barriers for Housing Court–referred clients. These practices have, upon information and belief, generated repeated concerns and complaints from tenants and advocates, and are sufficiently common and entrenched to constitute a custom, policy, or usage of the City of New York within the meaning of Monell v. Department of Social Services, 436 U.S. 658 (1978). APS's institutional failures—including deficient training, lack of ADA-compliant protocols, and tolerance of unverified "unable to locate" reporting—were the moving force behind the violations suffered by Plaintiffs and similarly situated disabled tenants. Absent structural reform, APS will continue to generate inaccurate reports that courts treat as dispositive, thereby systemically denying disabled tenants meaningful participation in Housing Court proceedings. Prospective relief is therefore

necessary not only to redress Plaintiffs' injuries, but to prevent the continued use of materially inaccurate or knowingly false APS determinations as a basis for eviction and other grave deprivations affecting disabled New Yorkers.

**SYSTEMIC FAILURES**

 (Opposing Counsel's Role + Judicial Obligations + Institutional Dysfunction)

30.     The failures in Plaintiffs' Housing Court matter were not isolated, personal, or accidental. They reflect systemic deficiencies in the institutional structure of the New York City Housing Court and APS—deficiencies that predictably, repeatedly, and disproportionately harm disabled litigants. These structural defects were a direct and proximate cause of the violations suffered by Plaintiffs and are central to the class-wide relief sought herein. The mishandling of Plaintiffs' September 15, 2025 ADA request, the failure to bring that request to the presiding judge's attention, APS's inaccurate "unable to locate" report, and the ADA office's post-judgment email focusing on APS logistics and generic OSC paperwork rather than court access together show how, even when multiple decisionmakers are involved, the system consistently produces the same discriminatory outcome for disabled tenants.

31.     Opposing counsel had actual notice of Plaintiffs' ADA filings and disability-related submissions, having received copies of Plaintiffs' letters, ADA requests, and medical communications before the inquest and default. Counsel's decision to remain silent while the Court proceeded under the false assumption that no ADA request existed constituted a material omission that, at a minimum, conflicted with (a) the duty of candor to the tribunal, (b) fairness obligations toward unrepresented and disabled litigants, (c) ethical requirements under 22 N.Y.C.R.R. § 1200 (Rules of Professional Conduct), and (d) the obligation not to assist in

conduct that deprives litigants of federally protected rights. Counsel knew, or reasonably should have known, that Plaintiffs' nonappearance was intertwined with unresolved ADA issues and APS misreporting, yet took no steps to correct the record or to ensure that the Court was aware of Plaintiffs' pending accommodation request before seeking an inquest and warrant of eviction. By remaining silent in the face of known ADA filings and APS inaccuracies, opposing counsel effectively ratified the institutional failures of Housing Court and APS and used those failures as litigation advantages against disabled tenants.

32.    Opposing counsel's silence affirmatively contributed to the deprivation of Plaintiffs' rights by magnifying the consequences of the Housing Court's ADA failures and permitting the Court to proceed on an incomplete and inaccurate record. Upon information and belief, this conduct reflects a broader pattern in Housing Court practice in which counsel allow defaults and inquests to move forward against disabled tenants whose ADA submissions have been ignored, misplaced, or mishandled, rather than alerting the Court to known accommodation requests. In this way, private litigants and their attorneys become de facto participants in the systemic denial of ADA rights, reinforcing institutional dysfunction rather than mitigating it. The role of private counsel in this ecosystem underscores that the discrimination alleged here is not limited to state actors' omissions, but extends to coordinated or acquiescent conduct by repeat-player landlords' attorneys who understand, and exploit, the weaknesses of the ADA infrastructure in Housing Court.

33.    Within the Unified Court System ("UCS"), the Office of Court Administration ("OCA"), Housing Court, and APS, there appear to be no effective safeguards ensuring

(a) accurate verification of ADA accommodation submissions,

(b) mandatory logging or tracking of ADA requests in court case-management systems,

(c) timely review of disability-related filings by ADA Coordinators or judicial officers,

(d) cross-referencing of APS representations against litigant communications or available evidence,

(e) heightened judicial diligence when disability barriers are raised,

(f) accommodations tailored to the needs of pro se, medically fragile, or mobility-impaired litigants, and

(g) oversight mechanisms to prevent defaults or adverse rulings while ADA requests remain pending. Plaintiffs' experience in Housing Court, combined with their experience in other state-court matters, demonstrates that whatever nominal policies may exist, they are not functioning in practice. The December 11, 2025 ADA email—acknowledging prior orders and attaching an OSC form but omitting any decision on Plaintiffs' ADA request—illustrates the absence of a functioning system for tracking, adjudicating, and enforcing accommodations before adverse action is taken. In practical terms, ADA requests disappear into administrative voids, leaving judges, clerks, and litigants to proceed as though no accommodations were ever sought.

34.    These systemic deficiencies are not confined to Plaintiffs' Housing Court case. Since approximately August 2025, Plaintiffs have submitted multiple ADA accommodation requests and Poor Person (fee-waiver) applications across several court systems—including Housing Court, Civil Court, Supreme Court, Small Claims Court, and other New York State proceedings. With the sole exception of the Southern District of New York, which granted Plaintiffs' in forma pauperis application and expressly recognized their disabilities, no court has issued any written ADA determination, acknowledgment, or response. In at least one matter, after waiting several months for an ADA decision and fee-waiver ruling, Plaintiffs were compelled to pay a filing fee

because no ADA or Poor Person decision was ever rendered. This multi-court pattern confirms that the failure to process ADA requests and fee-waiver applications is not a single-case anomaly but, upon information and belief, a recurring feature of the Unified Court System's operations. The contrast between SDNY's prompt, written rulings and the state courts' pattern of silence underscores that disabled litigants' lack of accommodations in state proceedings is the result of systemic administrative breakdown, not of any deficiency in Plaintiffs' requests or documentation. The statewide nature of this pattern makes clear that the problem is structural and policy-driven, not merely the product of one judge's or one clerk's oversight.

35.     These failures constitute systemic barriers to court access and violate the ADA's requirement that disabled individuals be afforded "meaningful access" to judicial services. Tennessee v. Lane, 541 U.S. 509, 533–34 (2004); Henrietta D. v. Bloomberg, 331 F.3d 261, 272–79 (2d Cir. 2003). A public entity's failure to implement and operate basic administrative structures to ensure ADA compliance is itself a form of discrimination under Title II. Here, the absence of basic mechanisms—such as a standardized ADA log, automatic docketing of ADA submissions, and mandatory judicial review before inquests—renders ADA rights effectively illusory for disabled tenants. Disabled litigants may formally "have" ADA rights on paper, but the operational reality of New York's Housing Court and related courts ensures that those rights rarely influence scheduling, defaults, inquests, or access to appellate review.

36.     The Constitution likewise requires procedures that avoid a "substantial risk of erroneous deprivation." Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Here, the risk of erroneous deprivation—eviction without a meaningful hearing, default judgments against disabled litigants, inquests conducted without participation, and the practical denial of appellate review—was not incidental but built into the system. The absence of reliable ADA logging, the lack of written

determinations, the uncritical acceptance of APS misstatements, the refusal to honor

disability-based requests for remote filing and remote appearance, and the judicial practice of

proceeding despite actual notice of disability combined to create a constitutionally intolerable

procedural environment. The events in Plaintiffs' case thus exemplify how structural ADA

failures and evidentiary shortcuts by APS converge to produce "erroneous deprivation" as the

predictable, not exceptional, outcome. Under Mathews, such a regime cannot be reconciled with

fundamental requirements of due process.

37.    These structural failings mirror those documented in Blatch v. Franco, 1998 WL 265132

(S.D.N.Y. 1998), where this Court found that systemic miscommunication between City agencies

and Housing Court resulted in widespread denial of due-process rights for disabled tenants. As in

Blatch, the failures here arise not from isolated human error but from institutional dysfunction

that requires class-wide structural remedies.

38.    Because these systemic practices operate across Housing Court, APS, and, upon

information and belief, other UCS courts, they affect not only Plaintiffs but also a large

population of disabled tenants citywide. Declaratory and injunctive relief under Fed. R. Civ. P.

23(b)(2) is therefore both appropriate and necessary. Without such relief, disabled tenants will

continue to face a regime in which ADA requests disappear into administrative voids, APS

misreports go unchallenged, and courts proceed as though no disability-related barriers exist,

thereby perpetuating ongoing violations of federal law. Only structural, court-ordered

reforms—rather than ad hoc assurances—can ensure that disabled tenants' rights to

accommodation and meaningful access are finally respected in New York's Housing Court

system.

# CAUSES OF ACTION

**FIRST CAUSE OF ACTION**

**Violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act**

(Failure to Accommodate, Failure to Ensure Effective Communication, and Discriminatory Methods of Administration)

(Against Defendants New York State Unified Court System, Office of Court Administration, New York City Housing Court, and the City of New York / APS)

42 U.S.C. § 12132; 29 U.S.C. § 794; 28 C.F.R. §§ 35.130, 35.160

1.      Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

2.      This First Cause of Action is asserted against: (a) the New York State Unified Court System and the Office of Court Administration (including the New York City Housing Court and its ADA/administrative components), through the official-capacity Defendants named herein, for prospective declaratory and injunctive relief; and (b) the City of New York, acting by and through the New York City Human Resources Administration and Adult Protective Services ("APS"), for prospective declaratory and injunctive relief and for damages, attorneys' fees, and costs.

3.      Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

4.      Section 504 of the Rehabilitation Act similarly provides that "no otherwise qualified individual with a disability… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

5.      Defendants New York State Unified Court System, Office of Court Administration, and the New York City Housing Court are "public entities" within the meaning of Title II. Defendant City of New York, acting by and through HRA/APS, operates "programs or activities" receiving federal financial assistance within the meaning of Section 504. Accordingly, they are subject to the requirements of 42 U.S.C. § 12131 et seq., 29 U.S.C. § 794, and their implementing regulations. See *Tennessee v. Lane*, 541 U.S. 509, 527–33 (2004); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272–79 (2d Cir. 2003).

6.      The Supreme Court has held that access to courts is a fundamental right, and that Title II requires affirmative accommodations to ensure disabled litigants' meaningful participation in judicial proceedings. *Lane*, 541 U.S. at 522–33. The Second Circuit likewise recognizes that public entities violate Title II and Section 504 when their systems, policies, or omissions deny disabled individuals "meaningful access" to public programs, including by failing to provide

reasonable modifications. *Henrietta D.*, 331 F.3d at 272–79.

7.      Title II and its regulations expressly require public entities to:

 a. refrain from utilizing criteria or methods of administration that have the effect of subjecting

individuals with disabilities to discrimination or defeating the objectives of the ADA, 28 C.F.R. §

35.130(b)(3);

 b. make reasonable modifications in policies, practices, or procedures when the modifications

are necessary to avoid discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(7); and

 c. furnish appropriate auxiliary aids and services to ensure "effective communication" with

individuals with disabilities, 28 C.F.R. § 35.160(a)–(b).

8.      The Second Circuit further recognizes that a public entity's failure to engage in the

interactive process necessary to identify and implement reasonable accommodations itself

constitutes discrimination under Title II and Section 504. See *Wright v. N.Y. State Dep't of Corr.*

*Servs.*, 831 F.3d 64, 72–73 (2d Cir. 2016); *Henrietta D.*, 331 F.3d at 273–77.

9.      Plaintiffs are "qualified individuals with disabilities" within the meaning of Title II and

Section 504. Their psychiatric and medical conditions substantially limit major life activities,

including mobility, ability to travel, ability to safely attend in-person court, and ability to endure

high-stress proceedings without serious destabilization. Plaintiffs were and are otherwise

qualified to participate in Housing Court proceedings and related appellate and collateral

processes.

10.    Defendants had actual and constructive knowledge of Plaintiffs' disabilities and access

barriers, including through:

 a. Plaintiffs' formal ADA Accommodation Request submitted to Housing Court on or about

September 15, 2025, together with a detailed narrative tying their disabilities to the need for

written and remote communication **(Ex. A)**;

 b. NYSCEF filings explicitly referencing ADA barriers and disability-based inability to appear,

visible and accessible on the Housing Court docket **(Ex. R);**

 c. emails and written submissions directed to ADA Coordinators and court staff explaining

Plaintiffs' health conditions and requesting remote appearance and written/electronic

communication;

 d. written correspondence to APS specifically requesting written-only communication and

explaining Plaintiffs' inability to participate in in-person APS interviews; and

 e. the Southern District of New York's grant of in forma pauperis status in a related federal

civil-rights action, reflecting federal-court recognition of Plaintiffs' disability-related limitations

and indigency **(Ex. E).**


11.    Despite this knowledge, Defendants failed to perform even the minimum obligations

required by Title II and Section 504, and instead:

a. maintained no reliable system for logging, timestamping, or tracking ADA accommodation

requests in Plaintiffs' Housing Court case, such that Plaintiffs' September 15, 2025 ADA request

was received by ADA staff but never adjudicated before the December 8, 2025 inquest and

judgment of possession;

b. failed to ensure that ADA requests were visible to, and reviewable by, the presiding Housing Court judge before defaults, inquests, or warrants were entered;

c. issued no written decision granting, denying, or modifying Plaintiffs' ADA requests prior to proceeding with adverse judicial actions;

d. refused to provide remote-appearance accommodations or other reasonable modifications to appearance and filing requirements, despite actual knowledge that Plaintiffs could not safely appear in person;

e. failed to engage in any meaningful interactive process with Plaintiffs to identify and implement effective accommodations tailored to their disabilities;

f. allowed Housing Court proceedings, including the December 8, 2025 inquest, to go forward while Plaintiffs' ADA request remained pending and unresolved; and

g. insisted that Plaintiffs appear in person to file a Notice of Appeal, and refused to accept an electronically submitted Notice of Appeal, notwithstanding a granted fee waiver and Plaintiffs' pending ADA request excusing in-person appearances.

12.    Defendants additionally employed criteria and methods of administration that foreseeably and systematically discriminated against disabled litigants, including:

a. reliance on informal, verbal-only checks with ADA staff that predictably produced erroneous conclusions that no ADA requests existed, even where such requests had been properly emailed and referenced in NYSCEF filings;

b. treating APS "unable to locate" notations as functional substitutes for any disability-sensitive inquiry or accommodation, despite direct APS contact with Plaintiffs and written communications already in APS's possession;

c. maintaining in-person-only expectations for critical hearings and for filing Notices of Appeal, without any parallel procedures for litigants whose disabilities make in-person attendance unsafe or impossible; and

d. enforcing Order to Show Cause and motion-calendar rules in a manner that penalized disability-caused nonappearance as if it were willful default, rather than a trigger for reasonable modification.

13.      Reasonable modifications to these policies and practices—including maintaining an ADA tracking log, requiring written ADA determinations before inquests or warrants, routinely permitting remote appearances for medically fragile litigants, accepting electronic filings when disability prevents in-person filing, and cross-checking APS reports against litigant communications and docket entries—would not fundamentally alter the nature of Housing Court or APS operations. Such measures are consistent with procedures already widely used across New York courts, especially since the COVID-19 pandemic.

14.      By failing to provide reasonable accommodations and modifications, failing to ensure effective communication, and employing methods of administration that foreseeably exclude disabled litigants from participation, Defendants denied Plaintiffs "meaningful access" to judicial and APS services within the meaning of *Henrietta D.*, 331 F.3d at 272–79, and *Lane*, 541 U.S. at

533–34.

15.     Defendants' escalation of adverse actions after Plaintiffs invoked ADA rights—including refusal of remote access, denial of motions based solely on disability-based absence, proceeding to inquest while ADA requests remained unresolved, and blocking appellate filing when Plaintiffs attempted to file electronically—further demonstrates discrimination "by reason of" disability and overlaps with retaliation and interference prohibited by ADA Title V, 42 U.S.C. § 12203.

16.     As a direct and proximate result of Defendants' violations of Title II and Section 504, Plaintiffs:

 a. were treated as having defaulted solely because their disabilities prevented in-person appearance;

 b. were excluded from the inquest at which their housing rights were adjudicated;

 c. were subjected to a judgment of possession and warrant of eviction entered while ADA requests remained pending and unresolved; and

 d. were effectively blocked from perfecting an appeal because the court refused to accept their electronically submitted Notice of Appeal, notwithstanding a granted fee waiver and a pending ADA request excusing in-person filing.

17.     Defendants' failures to accommodate, failures to ensure effective communication, and discriminatory methods of administration constitute disability discrimination "by reason of"

Plaintiffs' disabilities in violation of 42 U.S.C. § 12132, 29 U.S.C. § 794, and 28 C.F.R. §§ 35.130 and 35.160.

## SECOND CAUSE OF ACTION

**Violation of Title II of the ADA and Section 504 of the Rehabilitation Act – Failure to Ensure Effective Communication and Failure to Respond to Disability-Related Filings**
(Against Defendants New York State Unified Court System, Office of Court Administration, New York City Housing Court, and the City of New York / APS)
42 U.S.C. § 12132; 29 U.S.C. § 794; 28 C.F.R. § 35.160

18.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

19.     This Second Cause of Action is asserted against: (a) the New York State Unified Court System and the Office of Court Administration (including the New York City Housing Court and its ADA/administrative components), through the official-capacity Defendants named herein, for prospective declaratory and injunctive relief; and (b) the City of New York, acting by and through HRA/Adult Protective Services ("APS"), for prospective declaratory and injunctive relief and for damages, attorneys' fees, and costs.

20.     Title II of the ADA requires public entities to ensure "effective communication" with individuals with disabilities and to furnish appropriate auxiliary aids and services where necessary to afford such individuals "an equal opportunity to participate in, and enjoy the

31

benefits of," the entity's services, programs, and activities. 28 C.F.R. § 35.160(a)–(b).

21.     Section 504 of the Rehabilitation Act imposes parallel obligations on any program or activity receiving federal financial assistance, prohibiting disability-based exclusion or denial of benefits. 29 U.S.C. § 794(a).

22.     The Second Circuit has held that a public entity's failure to take reasonable steps to ensure effective communication with disabled individuals constitutes discrimination under both Title II and Section 504. *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156–58 (2d Cir. 2008); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272–79 (2d Cir. 2003).

23.     Plaintiffs notified Housing Court, UCS/OCA, APS, and multiple New York State courts that, because of their disabilities, they required:

 a. remote access in place of in-person appearances;

 b. the ability to communicate and file documents electronically or in writing rather than in person; and

 c. flexibility and clarity in deadlines, hearing logistics, and communication methods because of psychiatric, cognitive, and mobility limitations.

24.     Plaintiffs communicated these needs through, among other channels:

 a. a formal ADA Accommodation Request emailed to the Housing Court ADA office on or about September 15, 2025, accompanied by a detailed narrative request and later referenced in NYSCEF filings (**Ex. A, Ex. R**);

 b. NYSCEF letters and motions explicitly referencing ADA barriers, disability-based inability to appear in person, and the need for remote and written communication **(Ex. R)**;

 c. emails to ADA Coordinators and court staff explaining Plaintiffs' health conditions and requesting written and electronic communication instead of in-person appearances;

 d. written correspondence to APS specifically requesting written-only and remote communication, and explaining Plaintiffs' inability to participate safely in in-person APS interviews; and

 e. ADA and Poor Person (IFP) applications submitted in the Supreme Court, Civil Court, Small Claims Court, and Housing Court since approximately August 2025.

25.     With the sole exception of the Southern District of New York, which granted Plaintiffs' in forma pauperis application and thereby acknowledged their disability-related limitations and financial hardship **(Ex. E)**, no New York State court, ADA Coordinator, or APS office issued any written response, acknowledgment, or ruling on Plaintiffs' ADA accommodation requests or disability-based communication needs.

26.     In at least one state-court matter, after waiting several months for a ruling on an ADA and fee-waiver application, Plaintiffs were compelled to pay a filing fee despite their disability and indigency because no decision was ever rendered, illustrating that disability-related filings were effectively ignored rather than adjudicated.

27.     In the Housing Court matter underlying this case, court staff acknowledged that Plaintiffs' fee-waiver request for a Notice of Appeal had been granted, yet Housing Court

nevertheless insisted that Plaintiffs appear in person to file the Notice of Appeal, despite a pending ADA request excusing in-person appearances.

28.     When Plaintiffs, consistent with their disabilities and ADA request, submitted their Notice of Appeal and a detailed cover letter electronically—explaining their limitations, invoking the granted fee waiver, and requesting acceptance of the filing as a reasonable accommodation—the Court failed to file, process, or respond to the submission. Plaintiffs received no written communication and no conformed copy of the Notice of Appeal, effectively blocking appellate review.

29.     APS likewise failed to ensure effective communication by:

 a. ignoring Plaintiffs' written emails requesting disability-appropriate, written-only and remote communication;

 b. failing to respond to or acknowledge those emails in any meaningful way;

 c. mischaracterizing its in-person contact with Plaintiff Kenan as an "unable to locate" situation despite direct interaction at Plaintiffs' home and subsequent written communication; and

 d. failing to offer any alternative communication method or interview format (such as telephone, video, or written questionnaires) consistent with Plaintiffs' medical limitations.

30.     Housing Court, UCS/OCA, and APS failed to provide auxiliary aids, services, or reasonable modifications to communication procedures, including failing to:

a. respond to Plaintiffs' ADA letters or emails with any written acknowledgment or decision;

 b. annotate the docket or internal case-management systems to reflect that Plaintiffs had

34

requested ADA accommodations and disability-appropriate communication;

c. allow live remote participation at critical hearings, including the December 8, 2025 inquest, despite knowing of Plaintiffs' mobility and psychiatric limitations;

d. accept filings and the Notice of Appeal electronically, notwithstanding disability-based inability to appear in person;

e. issue written ADA determinations explaining the status, scope, grant, or denial of requested accommodations; and

f. ensure that presiding judges and clerks were actually informed of outstanding ADA and communication-related requests before proceeding to default, inquest, or warrant.

31.     These failures meant that Plaintiffs' disability-related communications were treated as if they did not exist, even when they were formally docketed (**as reflected in Ex. R**) or expressly acknowledged as received by the Housing Court ADA Designee on December 11, 2025. As a result, judicial and APS decisions were made without considering Plaintiffs' disability-related needs, medical limitations, or pending requests for accommodation.

32.     Under *Camarillo*, 518 F.3d at 158, and *Henrietta D.*, 331 F.3d at 272–79, the refusal to respond to disability-related communications, to provide accessible channels for communication, and to adjust communication methods to known disabilities constitutes denial of effective communication and "meaningful access" in violation of both Title II and Section 504.

33.     As a direct and proximate result of Defendants' failure to ensure effective communication, Plaintiffs:

a. were unable to participate in their Housing Court proceedings in any meaningful manner, including the inquest that determined their housing rights;

 b. were unable to perfect their appeal despite a granted fee waiver, because the court refused to process their electronically submitted Notice of Appeal;

 c. were denied clarity, predictability, and notice adequate for disabled litigants to understand and protect their rights; and

 d. were left in a state of procedural confusion and exclusion solely because of Defendants' refusal to adapt communication methods to their disabilities.

34.    Defendants' conduct constitutes disability discrimination under 42 U.S.C. § 12132, 29 U.S.C. § 794, and 28 C.F.R. § 35.160, and further demonstrates the systemic, class-wide nature of the ADA and Rehabilitation Act violations challenged in this action, warranting declaratory and injunctive relief, as well as damages from the municipal Defendant City of New York / APS.


## THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourteenth Amendment Procedural Due Process and First/Fourteenth Amendment Denial of Access to the Courts**
 (Against Defendants New York State Unified Court System, Office of Court Administration, New York City Housing Court, Hon. Joseph Zayas (official capacity), Hon. Daniele Chinea (official capacity), and the City of New York / APS)


35.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

36.     This Third Cause of Action is asserted under 42 U.S.C. § 1983 against: (a) the New York State Unified Court System ("UCS"), the Office of Court Administration ("OCA"), the New York City Housing Court, and Hon. Joseph Zayas and Hon. Daniele Chinea in their official capacities, for prospective declaratory and injunctive relief; and (b) the City of New York, acting by and through HRA/Adult Protective Services ("APS"), for prospective declaratory and injunctive relief and for damages, attorneys' fees, and costs.

37.     Plaintiffs possess a protected property interest in their continued residence in their home. The Supreme Court has long held that tenants' interests in their homes fall squarely within the protections of the Due Process Clause. *Greene v. Lindsey*, 456 U.S. 444, 450–51 (1982); *Escalera v. N.Y.C. Hous. Auth.*, 425 F.2d 853, 861–62 (2d Cir. 1970).

38.     The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Due process demands an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

39.     The First Amendment protects the right "to petition the Government for redress of grievances," which includes meaningful access to courts. The Fourteenth Amendment independently guarantees a right of access to the courts. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004).

40.     When court procedures, rules, or administrative practices, as applied, prevent a disabled litigant from appearing, presenting evidence, or perfecting an appeal, any theoretical "notice" or "opportunity to be heard" is not meaningful within the meaning of *Mathews* and amounts to a denial of due process and court access.

41.     Housing Court, UCS/OCA, and APS deprived Plaintiffs of procedural due process and access to the courts by, among other things:

 a. treating disability-caused nonappearance as intentional default rather than as a barrier requiring reasonable accommodation and modification of appearance requirements;

 b. failing to locate, docket, or adjudicate Plaintiffs' September 15, 2025 ADA Accommodation Request and related disability filings before entering default, conducting an inquest on December 8, 2025, and issuing a warrant of eviction;

 c. relying on APS's materially inaccurate "unable to locate" report despite Plaintiffs' contrary written communications and available video and email evidence;

 d. refusing to provide remote participation or other alternative means of appearance despite actual knowledge that Plaintiffs' psychiatric and medical disabilities made in-person attendance unsafe and impracticable;

 e. conducting an inquest in Plaintiffs' absence while ADA requests remained pending and unresolved; and

 f. issuing a judgment of possession and warrant of eviction without affording Plaintiffs any practical, functional opportunity to participate in their own eviction proceedings.

42.     These deprivations did not result from a single, isolated mistake, but from the operation of Housing Court and APS procedures that, as applied to disabled litigants, made participation impossible without jeopardizing their health, thereby rendering the process constitutionally defective even if formal notice was technically provided.

43.     Housing Court and UCS/OCA further deprived Plaintiffs of due process and court access in connection with their attempted appeal. After court staff acknowledged that Plaintiffs' fee-waiver request for the Notice of Appeal had been granted, Housing Court nevertheless insisted that Plaintiffs appear in person to file the Notice, despite a pending ADA request excusing in-person appearances.

44.     When Plaintiffs, consistent with their disabilities, submitted their Notice of Appeal and a detailed cover letter electronically—invoking the granted fee waiver and requesting acceptance as a reasonable accommodation—Housing Court failed to file, process, or respond to the submission, thereby effectively blocking Plaintiffs from initiating appellate review solely because of their disabilities and their inability to appear in person.

45.     APS's misinformation compounded these due-process violations. APS issued an "unable to locate" report after (a) visiting Plaintiffs' home and speaking directly with Plaintiff Kenan, and (b) receiving written email communications in which Plaintiffs requested written-only and remote contact. Housing Court nevertheless relied on this report in adjudicating Plaintiffs' rights.

46.     The Second Circuit recognizes that when fabricated, materially inaccurate, or knowingly misleading government reports are used to justify adverse action, the resulting deprivation violates the Fourteenth Amendment. *Southerland v. City of New York*, 680 F.3d 127, 162–66 (2d Cir. 2012). Here, APS's "unable to locate" report, adopted uncritically by Housing Court, supplied the false factual premise on which Plaintiffs' absence was treated as willful and their eviction was ordered.

47.     Judicial actors had actual and constructive knowledge of Plaintiffs' disabilities, ADA filings, and the Southern District of New York's recognition of Plaintiffs' disability-related limitations and indigency **(Ex. E)**. That knowledge created a heightened obligation to ensure that procedures did not become structurally inaccessible to Plaintiffs and that disability-based barriers were addressed before imposing case-dispositive sanctions.

48.     Instead, Housing Court and UCS/OCA relied on methods and practices that foreseeably excluded disabled litigants from participation, including: ignoring docketed ADA references, failing to obtain or review ADA office records, refusing to offer remote access, and proceeding as though no ADA requests existed. These practices created an "intolerable risk of erroneous deprivation" of a protected property interest within the meaning of *Mathews*, 424 U.S. at 335, and are actionable under *Zinermon v. Burch*, 494 U.S. 113, 125–30 (1990).

49.     The same conduct also burdened Plaintiffs' First Amendment right to petition and their Fourteenth Amendment right of access to the courts by: (a) preventing their participation in the trial-level eviction proceedings; and (b) erecting disability-based barriers to filing and perfecting

an appeal, such that Plaintiffs' claims could not be heard by any court in any meaningful way. See *Christopher*, 536 U.S. at 415–16.

50.     Opposing counsel, despite receiving Plaintiffs' ADA-related correspondence and knowing that the Court was proceeding under the false premise that no ADA request existed, remained silent. That silence materially contributed to the deprivation by preventing the tribunal from correcting critical factual errors and by facilitating adjudication on a demonstrably incomplete and distorted record.

51.     Taken together, Defendants' acts and omissions created exactly the kind of "intolerable risk of erroneous deprivation" that *Mathews* condemns, and reflect the failure of state actors to implement even minimal safeguards against wrongful deprivation of housing and court access. See *Mathews*, 424 U.S. at 335; *Zinermon*, 494 U.S. at 125–30.

52.     As a direct and proximate result of Defendants' conduct, Plaintiffs:

a. were excluded from meaningful participation in their own eviction proceedings;

 b. were adjudicated in default solely because of disability-related barriers to in-person participation;

 c. were subjected to an inquest and eviction warrant without constitutionally adequate process; and

 d. were effectively denied access to appellate review of the Housing Court judgment.

53.     Defendants' actions and omissions violated Plaintiffs' rights to procedural due process and meaningful access to the courts under the First and Fourteenth Amendments and are

actionable pursuant to 42 U.S.C. § 1983, entitling Plaintiffs to declaratory and injunctive relief against the official-capacity state defendants and to declaratory, injunctive, and monetary relief against the municipal Defendant City of New York / APS.


## FOURTH CAUSE OF ACTION

**Violation of Section 504 of the Rehabilitation Act – Disability Discrimination**

 (Against Defendants New York State Unified Court System, Office of Court Administration, New York City Housing Court, and the City of New York / APS)

 29 U.S.C. § 794


54.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.


55.    This Fourth Cause of Action is asserted under Section 504 of the Rehabilitation Act against: (a) the New York State Unified Court System ("UCS"), the Office of Court Administration ("OCA"), and the New York City Housing Court, through the state officials named in their official capacities, for prospective declaratory and injunctive relief; and (b) the City of New York, acting by and through HRA/Adult Protective Services ("APS"), for prospective declaratory and injunctive relief and for damages, attorneys' fees, and costs.


56.    Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal

financial assistance. 29 U.S.C. § 794(a).

57.    UCS, OCA, and the New York City Housing Court receive federal financial assistance
for court administration and access-to-justice–related programs, and APS receives federal
funding for social-service and protective-services functions. Each is therefore a "program or
activity" covered by Section 504. See generally *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158
(2d Cir. 2008).

58.    The Second Circuit applies essentially the same substantive standards to Section 504 and
Title II of the ADA: public entities and federally funded programs must provide reasonable
accommodations and modify policies and practices that impede access for individuals with
disabilities; failure to do so constitutes discrimination. *Wright v. N.Y. State DOCS*, 831 F.3d 64,
72 (2d Cir. 2016); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272–79 (2d Cir. 2003).

59.    Plaintiffs are "otherwise qualified" individuals with disabilities within the meaning of
Section 504: they are fully capable of participating in Housing Court and APS-related processes
if provided reasonable accommodations such as remote access, written/electronic
communication, and disability-appropriate scheduling, but their psychiatric and medical
conditions substantially limit major life activities, including mobility, travel, and in-person
participation in court and agency proceedings.

60.    Defendants had explicit, repeated notice of Plaintiffs' disabilities and accommodation
needs through, among other things:

a. Plaintiffs' formal ADA Accommodation Request in the Housing Court matter, submitted on or about September 15, 2025 and later referenced in the NYSCEF docket **(Ex. A; Ex. R);**

b. written disability-related communications to UCS and Housing Court ADA Coordinators describing Plaintiffs' inability to appear in person and requesting remote, written, and electronic communication;

c. written emails and letters to APS specifically requesting written-only and remote communication and explaining that in-person interviews would be medically unsafe and destabilizing; and

d. the Southern District of New York's prior grant of in forma pauperis status in a related civil-rights action, acknowledging Plaintiffs' disability-related limitations and indigency **(Ex. E).**

61.     Despite this notice, UCS, OCA, Housing Court, and APS denied Plaintiffs meaningful access to their programs and services by refusing to modify standard procedures in even minimal ways to account for Plaintiffs' disabilities, including by:

a. ignoring, failing to log, or failing to track Plaintiffs' ADA requests and disability-related filings;

b. refusing to provide remote-participation accommodations necessary for Plaintiffs to attend Housing Court proceedings safely;

c. issuing no written accommodation determinations before entering default, conducting the December 8, 2025 inquest, or issuing an eviction warrant; and

d. relying on APS's materially inaccurate "unable to locate" report in the face of contrary written and video evidence showing direct contact and active communication.

62.     APS, acting as a federally funded program for purposes of Section 504, further discriminated against Plaintiffs "solely by reason of" their disabilities by:

 a. refusing to honor Plaintiffs' written requests for written-only and remote communication;

 b. failing to respond meaningfully to Plaintiffs' disability-based emails;

 c. conducting an in-person visit at Plaintiffs' home despite knowing that such contact conflicted with Plaintiffs' medical limitations and their ADA request;

 d. departing after ringing the bell without leaving a card, note, or any means of contact, and then characterizing the interaction as if Plaintiffs could not be located; and

 e. issuing an "unable to locate" determination notwithstanding prior in-person contact, email correspondence, and Housing Court filings identifying Plaintiffs and their address.

63.     By closing Plaintiffs' APS case on an "unable to locate" pretext that arose only because APS refused to accommodate disability-based communication requests, APS effectively excluded Plaintiffs from the very APS process Housing Court later used as a basis for adverse action. That exclusion was not grounded in neutral, non-discriminatory criteria, but in APS's unwillingness to modify its usual in-person model for disabled individuals.

64.     Housing Court then adopted APS's inaccurate report, refused to provide remote access, proceeded as though no ADA or disability-related filings existed, and adjudicated Plaintiffs' rights in their absence. But for Plaintiffs' disabilities and Defendants' refusal to accommodate them, Plaintiffs could and would have participated in the eviction proceedings and pursued appellate review.

65.     Defendants' conduct—ignoring disability filings, refusing remote access, relying on an "unable to locate" report manufactured by their own refusal to accommodate, and conditioning appeal on in-person filing that Plaintiffs could not medically perform—constitutes exclusion from, and denial of the benefits of, their programs "solely by reason of" Plaintiffs' disabilities within the meaning of 29 U.S.C. § 794(a).

66.     To the extent monetary relief is sought from the City of New York / APS, Defendants' actions were at least deliberately indifferent to Plaintiffs' federally protected rights: Plaintiffs repeatedly put Defendants on notice—in writing and by formal ADA submissions—that existing procedures were denying them access, yet Defendants chose not to act, not to adjust procedures, and instead to rely on an "unable to locate" narrative they knew or should have known was inaccurate. See *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275–76 (2d Cir. 2009).

67.     As a direct and proximate result of these Section 504 violations, Plaintiffs were denied meaningful access to their eviction proceedings and appellate process, were defaulted because of disability-related barriers, were subjected to an inquest and eviction warrant without participation, and suffered the loss or threatened loss of their home and related constitutional protections.

68.     Defendants' actions and omissions therefore violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and entitle Plaintiffs to declaratory and injunctive relief against the state-system Defendants and to declaratory, injunctive, and monetary relief against the municipal

Defendant City of New York / APS, together with reasonable attorneys' fees and costs under 29 U.S.C. § 794a and 42 U.S.C. § 1988.

## FIFTH CAUSE OF ACTION

**Procedural Due Process, Denial of Access to Courts, and Impartial Tribunal**

 **First and Fourteenth Amendments – 42 U.S.C. § 1983**

 (Against Defendants New York State Unified Court System, Office of Court Administration, New York City Housing Court, Hon. Joseph Zayas (official capacity), Hon. Daniele Chinea (official capacity), and the City of New York / APS)

69.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

70.     This Fifth Cause of Action is brought under 42 U.S.C. § 1983 against: (a) the New York State Unified Court System ("UCS"), the Office of Court Administration ("OCA"), and the New York City Housing Court, together with Hon. Joseph Zayas and Hon. Daniele Chinea in their official capacities, for prospective declaratory and injunctive relief; and (b) the City of New York, acting by and through HRA/Adult Protective Services ("APS"), for prospective declaratory and injunctive relief and for damages, attorneys' fees, and costs.

71.     Plaintiffs possess a constitutionally protected property interest in their continued residence in their home. The Supreme Court has long held that tenants' interests in their homes are protected by the Due Process Clause. *Greene v. Lindsey*, 456 U.S. 444, 450–51 (1982).

72.     Due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Procedures that, as applied, make meaningful participation impossible for disabled litigants are constitutionally defective, even if formal notice is technically provided.

73.     The First Amendment protects the right "to petition the Government for redress of grievances," and the Fourteenth Amendment independently guarantees a right of access to the courts. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004). Access to appellate review is a core component of that right.

74.     Disabled litigants are entitled to procedures that do not make participation practically impossible because of disability-related limitations. When court rules, practices, or omissions effectively require a disabled person to jeopardize their health in order to appear or file—without offering reasonable alternatives—the resulting process is neither meaningful nor constitutionally adequate under *Mathews*.

75.     Housing Court, UCS/OCA, and APS deprived Plaintiffs of procedural due process and court access by, among other things:

 a. treating disability-caused nonappearance as intentional default, rather than as a barrier requiring reasonable accommodation and modification of appearance requirements;

 b. failing to adjudicate or even meaningfully consider Plaintiffs' ADA accommodation requests before entering default, conducting an inquest, and issuing a warrant of eviction;

 c. relying on APS's materially inaccurate "unable to locate" representation despite Plaintiffs'

contrary communications, video evidence, and written submissions;

 d. refusing to provide remote access to proceedings despite actual knowledge that Plaintiffs'

medical and psychiatric disabilities made in-person appearance unsafe and impracticable;

 e. proceeding to inquest in Plaintiffs' absence while ADA requests remained pending and

unresolved; and

 f. issuing a judgment of possession and warrant of eviction without ever affording Plaintiffs a

practical, real-world opportunity to participate in the adjudication of their rights.


76.     Housing Court further violated due process and the right of access to courts by effectively

blocking Plaintiffs' appeal. After court staff acknowledged that Plaintiffs' fee waiver for the

Notice of Appeal had been granted, Housing Court nevertheless insisted that Plaintiffs appear in

person to file the Notice, notwithstanding a pending ADA request excusing in-person

appearances.


77.     When Plaintiffs, consistent with their disabilities, submitted the Notice of Appeal and a

detailed cover letter electronically and requested acceptance pursuant to the fee waiver and ADA

accommodation, the Court failed to file, respond to, or process the appeal at all. This denial of

any functional avenue to initiate appellate review—based solely on Plaintiffs' inability to appear

in person—constitutes a direct violation of their First and Fourteenth Amendment rights of

access to the courts.


78.     The Court's reliance on materially inaccurate APS information constitutes a separate

due-process violation where government-created misinformation becomes the basis for an

adverse determination. See *Southerland v. City of New York*, 680 F.3d 127, 162–66 (2d Cir. 2012). Adjudicating rights based on an "unable to locate" report that APS knew or should have known was inconsistent with its own prior contact and written communications is incompatible with the Fourteenth Amendment.

79.     Due process also guarantees a fair and impartial tribunal. *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). A tribunal becomes constitutionally defective where structural failures or systemic omissions prevent fair evaluation of evidence or meaningful consideration of disability-based submissions.

80.     Judge Chinea's refusal to acknowledge ADA-related filings visible on the docket, to obtain or review ADA office records, to pause proceedings pending ADA review, to consider Plaintiffs' documented medical limitations, or to reconcile APS's misstatements with contrary evidence and with the Southern District of New York's prior recognition of Plaintiffs' disabilities collectively deprived Plaintiffs of a neutral adjudicatory process and produced a structurally biased proceeding. See *Zinermon v. Burch*, 494 U.S. 113, 126–30 (1990).

81.     Judicial actors had actual and constructive knowledge of Plaintiffs' disabilities, ADA filings, and federal-court recognition of Plaintiffs' indigency and limitations **(Ex. E),** giving rise to a heightened duty to ensure that proceedings did not become effectively inaccessible to them. Instead, the court employed procedures that predictably excluded disabled litigants from participation, thereby violating both constitutional and statutory mandates.

82.    These structural defects affected not only the outcome, but the fundamental character of the tribunal: a court that proceeds in the face of known disability barriers and unresolved ADA requests, while relying on unreconciled APS misinformation, is not functioning as a neutral decisionmaker but as an institution structurally tilted against disabled litigants. See *Ward*, 409 U.S. at 61–62.

83.    Opposing counsel's silence—despite receiving Plaintiffs' ADA correspondence and knowing that the Court was proceeding under the false premise that no ADA request existed—materially contributed to the deprivation by preventing the tribunal from correcting a critical factual error. Counsel's omission amplified the procedural defects, magnified the impact of APS's misinformation, and further undermined Plaintiffs' ability to be heard, reinforcing a process that was already structurally biased against disabled litigants.

84.    Defendants' combined conduct created an "intolerable risk of erroneous deprivation," the benchmark articulated in *Mathews*, 424 U.S. at 335, and recognized as actionable under § 1983 where state officials fail to implement even minimal safeguards against wrongful deprivation of liberty or property. See *Zinermon*, 494 U.S. at 125–30.

85.    As a direct and proximate result of these actions and omissions, Plaintiffs were excluded from meaningful participation in their own eviction proceedings, effectively blocked from perfecting an appeal, and subjected to default, inquest, and an eviction warrant without constitutionally adequate process or a genuinely impartial tribunal.

86.     Defendants' conduct violated Plaintiffs' rights to procedural due process, meaningful access to the courts, and a fair and impartial tribunal under the First and Fourteenth Amendments and is actionable pursuant to 42 U.S.C. § 1983, entitling Plaintiffs to declaratory and injunctive relief against the official-capacity state defendants and to declaratory, injunctive, and monetary relief against the municipal Defendant City of New York / APS.

## SIXTH CAUSE OF ACTION

**Monell Municipal Liability (City of New York / APS, Including Failure to Train and Supervise) 42 U.S.C. § 1983**
(Against Defendant City of New York, acting by and through HRA / Adult Protective Services ("APS"))

87.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

88.     This Sixth Cause of Action is brought under 42 U.S.C. § 1983 solely against Defendant City of New York ("City"), acting by and through its agency HRA / Adult Protective Services ("APS"), for declaratory and injunctive relief and for compensatory damages, attorneys' fees, and costs.

89.     The City of New York is a "person" within the meaning of 42 U.S.C. § 1983 and is liable when its policies, customs, or practices are the "moving force" behind constitutional violations and violations of federally protected rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94

(1978).

90.    APS plays a critical, recurring role in Housing Court–related eviction matters,
particularly where tenants are disabled or referred for "protective" assessment. In this role, APS
operates not as an isolated caseworker, but as an institutional actor whose reports, classifications,
and communications predictably shape Housing Court outcomes.

91.    APS maintains longstanding, widespread customs and practices that foreseeably and
systematically deprive disabled tenants of their federal rights in Housing Court–related matters,
including:

 a. issuing unverified "unable to locate" reports without confirming actual contact, reviewing
available email or written communications, or reconciling prior in-person interactions;

 b. failing to engage with or respond to disability-based written communications, including
explicit requests for written-only contact or remote interaction;

 c. insisting on in-person visits despite written notice that such contacts are medically unsafe, and
then treating disability-related limitations on in-person interaction as evidence that tenants are
"uncooperative" or "unavailable";

 d. treating Housing Court–referred disabled litigants as ordinary APS "subjects," rather than
ensuring that they are routed to proper ADA channels and disability-appropriate protocols; and

 e. generating conclusory "unable to locate" or "case closed" reports that Housing Court
routinely accepts without scrutiny, foreseeably resulting in defaults, inquests, and eviction
warrants against disabled tenants who are, in fact, present, communicative, and attempting to

engage through disability-appropriate means.

92.     These customs and practices were not aberrational in Plaintiffs' case; they tracked an

established APS pattern in which written ADA-style communications are ignored,

in-person-only visits are attempted despite medical limitations, and a negative notation ("unable

to locate") is recorded whenever the tenant cannot safely participate in a conventional home

interview.

93.     These APS customs and practices were the direct operational mechanism that misled

Housing Court in Plaintiffs' case, caused the Court to deny accommodations, and contributed to

the ADA, Rehabilitation Act, due-process, and court-access violations alleged herein. APS's

misinformation and procedural neglect were the "moving force" behind the deprivation of

Plaintiffs' rights within the meaning of *Monell*, 436 U.S. at 694.

94.     Separately and in combination with these customs, the City of New York is liable under §

1983 for its failure to train and supervise APS investigators, supervisors, and managers regarding

disability rights, Housing Court referrals, and the legal significance of "unable to locate"

classifications, where that failure amounts to deliberate indifference to the rights of disabled

individuals. See *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989); *Connick v. Thompson*,

563 U.S. 51, 61 (2011).

95.     APS investigators and supervisors are inadequately trained and supervised with respect

to:

a. recognizing and responding to disability-based communication requests (including written-only or remote communication);

b. properly documenting attempted visits and accurately describing contacts with disabled tenants, as opposed to defaulting to "unable to locate" when a conventional in-person interview does not occur;

c. verifying whether a disabled individual is truly "unable to be located" in light of prior in-person contact, email correspondence, or court-filed documents that identify the tenant, address, and disability-related limitations;

d. understanding and honoring obligations under ADA Title II and Section 504 when APS is involved in matters connected to court proceedings, including the need for individualized, disability-sensitive assessment; and

e. avoiding reliance on informal, verbal-only internal practices that predictably produce erroneous "no contact" or "unable to locate" conclusions for disabled people who have requested nontraditional, but reasonable, communication methods.

96.     The risk that untrained or poorly supervised APS staff would misclassify disabled, court-referred tenants as "unable to locate" is obvious: APS workers routinely interact with medically fragile and psychiatrically disabled individuals, and their conclusions are regularly transmitted to Housing Court and relied upon in eviction matters. The City therefore knew, or should have known, that inadequate training and supervision in this area posed a highly predictable risk of constitutional and statutory violations. See *City of Canton*, 489 U.S. at 390.

97.    The City and APS were on notice—through repeated complaints by tenants and
advocates, through the inherent role APS plays in eviction-related matters, and through the
nature of APS's work with disabled populations—that existing training and oversight were
insufficient to prevent misreporting and disability-based exclusion from APS processes and
Housing Court proceedings.

98.    Despite this notice, the City took no meaningful steps to implement mandatory
verification protocols, to require cross-checking of "unable to locate" determinations against
email or written records, or to train APS staff on honoring written-only and remote
communication requests from disabled individuals. This persistent inaction in the face of an
obvious risk constitutes deliberate indifference under *City of Canton* and *Connick*.

99.    As a direct and proximate result of the City's customs, policies, and
deliberate-indifference failures in training and supervision:

a. APS issued a materially inaccurate "unable to locate" report regarding Plaintiffs, even though
APS had visited Plaintiffs' home, spoken with Plaintiff Kenan, and corresponded by email;

b. APS failed to engage with Plaintiffs' disability-based communications or to offer written-only
or remote assessment as requested;

c. Housing Court was provided with an affirmatively misleading APS narrative that Plaintiffs
were "unable to be located," which the Court relied upon in denying accommodations, treating
nonappearance as default, and proceeding to inquest; and

d. Plaintiffs were thereby subjected to default, inquest, and an eviction warrant without meaningful participation, in violation of the Fourteenth Amendment, ADA Title II, and Section 504.

100.    These municipal customs and failures were the moving force behind the violations of Plaintiffs' rights under the Fourteenth Amendment (procedural due process and access to courts) and under the ADA and Rehabilitation Act, and they continue to endanger similarly situated disabled tenants citywide who are routed through APS in connection with Housing Court matters.

101.    Accordingly, Defendant City of New York is liable under 42 U.S.C. § 1983 and *Monell* for the constitutional and statutory violations caused by APS's customs, policies, and deliberate-indifference failures in training and supervision, and Plaintiffs are entitled to declaratory and injunctive relief, together with compensatory damages, attorneys' fees, and costs.

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

**Class Certification**

102.    Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), certify a Plaintiff Class defined as:

 *All present and future tenants with disabilities in New York City who request, or will request,*

*accommodations under the Americans with Disabilities Act or the Rehabilitation Act in Housing*

*Court eviction or holdover proceedings and who are subjected to defaults, inquests, eviction*

*warrants, or other adverse judicial actions because their accommodation requests were ignored,*

*mishandled, denied without process, or lost,*

*and appoint Plaintiffs as class representatives and their subsequently retained counsel as class*

*counsel.*

**Declaratory Judgment**

103.    Pursuant to 28 U.S.C. §§ 2201–2202, declare that Defendants' policies, practices,

customs, methods of administration, and failures to train and supervise violate, individually and

collectively:

 (a) Title II of the Americans with Disabilities Act;

 (b) Title V of the ADA (anti-retaliation and anti-interference);

 (c) Section 504 of the Rehabilitation Act;

 (d) 42 U.S.C. § 1983, including enforcement of:

       (i) the First Amendment right to petition and access the courts;

       (ii) the Fourteenth Amendment right to procedural due process;

       (iii) the Fourteenth Amendment right to equal protection (in the alternative); and

 (e) the federal right of access to courts and to meaningful appellate review;

 and declare that these violations constitute ongoing, systemic denials of meaningful access to

judicial proceedings for disabled tenants in New York City and must be remedied through

structural, forward-looking relief.

**Permanent Injunctive Relief (Structural / Class-Wide)**

104.    Enter a permanent injunction requiring Defendants—including, without limitation, the New York State Unified Court System, the Office of Court Administration, the New York City Civil Court / Housing Part, the City of New York, and Adult Protective Services, and their officers in their official capacities—to adopt, implement, and enforce constitutionally compliant and ADA/RA-compliant procedures guaranteeing disabled litigants meaningful access to Housing Court and related appellate processes. Such relief shall include, at minimum:

**Mandatory ADA Logging and Tracking System**

105.    Implementation of a uniform, statewide ADA logging and tracking system for receiving, timestamping, logging, tracking, and preserving all ADA accommodation requests in Housing Court, integrated into court case-management systems and visible to judges, clerks, litigants, and ADA Coordinators.

**Written ADA Determinations Before Adverse Action**

106.    A requirement that ADA Coordinators and/or designated judicial officers issue written determinations on all ADA accommodation requests—granting, denying, or modifying the request—before any default, inquest, judgment of possession, warrant of eviction, or comparable adverse judicial action may proceed.

**Guaranteed Remote Participation and Effective Communication**

107.    Procedures guaranteeing that qualified disabled litigants are afforded remote or virtual participation, and other effective-communication accommodations, whenever disability prevents

or substantially limits in-person participation, without burdensome or medically unsafe justifications, and including accommodations for:

(a) hearings, trials, and inquests;

(b) filing of pleadings, motions, and Orders to Show Cause; and

(c) Notices of Appeal and appellate filings.

**Moratorium on Adverse Actions While ADA Issues Are Pending**

108.    A prohibition on scheduling hearings, entering defaults, conducting inquests, issuing warrants of eviction, or taking other adverse judicial action while any ADA accommodation request, reconsideration, or appeal remains pending or unresolved, and a requirement that the docket clearly reflect the status of such ADA requests.

**APS Investigative and Reporting Reforms**

109.    Mandated disability-competent APS protocols, including at minimum:

(a) documented attempts at written and electronic communication when disability limits in-person contact;

(b) review and consideration of disability information before any finding concerning a Housing Court–referred tenant;

(c) verification steps and supervisory review before issuing any "unable to locate" or similar report;

(d) cross-checking APS representations against Housing Court filings, NYSCEF entries, and litigant communications; and

(e) mechanisms to correct, retract, or supplement inaccurate APS reports provided to courts.

**Reforms to Methods of Administration and OSC / Motion Procedures**

110.    Modification of policies, practices, and methods of administration that foreseeably disadvantage disabled litigants, including:

(a) elimination of purely verbal "no ADA request" checks in favor of written docket and ADA-log review;

(b) revision of Order to Show Cause and motion procedures so that disability-caused nonappearance is treated as a trigger for reasonable modification, not as automatic default; and

(c) uniform rules requiring courts to pause proceedings when ADA requests or Poor Person applications from disabled litigants remain undecided, particularly where in-person filing is not feasible.

**Ethical and Procedural Duties of Opposing Counsel**

111.    Adoption and enforcement of rules requiring attorneys appearing in Housing Court—whether private counsel, Legal Aid/Legal Services, or government attorneys—to:

(a) disclose to the tribunal any known ADA accommodation requests or documented disability barriers raised by opposing litigants; and

(b) refrain from advocating or remaining silent in ways that affirmatively rely on the court's ignorance of such requests, all in a manner consistent with 22 N.Y.C.R.R. § 1200 (Rules of Professional Conduct).

**Mandatory Training and Supervision**

112.    Comprehensive, recurring training for all Housing Court judges, court attorneys, clerks, ADA Coordinators, APS investigators, supervisors, and relevant City and State personnel regarding:

(a) obligations under ADA Title II, ADA Title V, and § 504;

 (b) reasonable-modification requirements and effective-communication standards;

 (c) duties to avoid methods of administration that discriminate against disabled individuals;

 (d) access-to-courts, due-process, and equal-protection principles as applied to disabled litigants; and

 (e) proper handling, logging, and adjudication of ADA and Poor Person requests.

**Monitoring, Reporting, and Federal Oversight**

113.    Establishment of a monitoring and compliance framework, modeled in part on *Blatch v. Franco*, 1998 WL 265132 (S.D.N.Y. 1998), including:

(a) periodic public reporting by UCS, OCA, and APS on ADA requests, determinations, and complaint statistics;

 (b) internal UCS audits and APS audits of ADA and § 504 compliance;

 (c) appointment of an independent monitor or similar oversight mechanism;

 (d) mandatory corrective-action plans where violations or patterns of noncompliance are found; and

 (e) continuing federal judicial oversight for a duration and on terms the Court deems necessary to secure lasting compliance.

**Damages Against Municipal / Non-Immune Defendants**

114.    Award compensatory damages against the City of New York and APS, in an amount to be determined at trial, for injuries proximately caused by their policies, customs, practices, and deliberate-indifference failures, including but not limited to emotional distress, loss and threatened loss of housing, and interference with Plaintiffs' civic and advocacy work, together with pre- and post-judgment interest as allowed by law.

**Attorneys' Fees and Legal Costs**

115.    Award reasonable attorneys' fees, expert fees, and litigation expenses under 42 U.S.C. § 1988, 42 U.S.C. § 12205 (ADA), 29 U.S.C. § 794a(b) (Rehabilitation Act), and all other applicable fee-shifting statutes, to become payable upon Plaintiffs' retention of counsel in this action.

**Leave to Amend**

116.    Grant Plaintiffs leave to amend this Complaint to add parties, claims, or additional facts as may be revealed through discovery or subsequent developments, including to refine the class definition and requested structural relief.

**ADA Accommodations in This Action**

117.    Order that Plaintiffs be provided all reasonable accommodations necessary for meaningful access to this federal proceeding, including but not limited to remote participation, electronic service and filing, modified deadlines where medically necessary, and other effective-communication measures, consistent with this Court's prior recognition of Plaintiffs' disabilities and indigency through its grant of in forma pauperis status in a related case.

**In Forma Pauperis Status**

118.    Permit Plaintiffs to proceed in forma pauperis pursuant to 28 U.S.C. § 1915, or reaffirm such status as appropriate for this action, and ensure that fee-related procedures do not themselves become barriers to disabled litigants' access to this Court.

**Further Relief**

119.    Grant such other and further relief, legal or equitable, general or specific, as this Court deems just and proper to remedy ongoing and systemic violations and to ensure durable compliance with the ADA, the Rehabilitation Act, the Constitution, and 42 U.S.C. § 1983.

120.    For avoidance of doubt, this action does not seek to disturb, invalidate, reverse, or enjoin any specific order or judgment of the New York City Housing Court, but instead seeks prospective, structural, and class-wide relief to remedy ongoing federal-law violations in Defendants' policies and practices, consistent with the limitations of the Rooker–Feldman and Younger doctrines.

Respectfully submitted,

/s/ Magdalena Kulisz
Magdalena Kulisz
Pro Se Plaintiff

/s/ Shahar Kenan
Shahar Kenan
Pro Se Plaintiff
d/b/a Miss Immigrant USA

c/o Miss Immigrant USA
209 East 83rd Street, #1
New York, NY 10028
Tel: (917) 300-8395

Email: missimmigrantusa@gmail.com

Ex. A



Miss Immigrant USA <missimmigrantusa@gmail.com>

---

## Fwd: ADA Accommodation Request – Lerch & Tapper v. Kulisz & Kenan (Index No. 307838-25/NY)

1 message

---

**Miss Immigrant Organization** <missimmigrantusa@gmail.com>                    Mon, Sep 15, 2025 at 12:21 PM
To: ADANYNYCCIV@nycourts.gov

---

---------- Forwarded message ---------
From: **Miss Immigrant Organization** <missimmigrantusa@gmail.com>
Date: Mon, Sep 15, 2025 at 12:14 PM
Subject: ADA Accommodation Request – Lerch & Tapper v. Kulisz & Kenan (Index No. 307838-25/NY)
To: <ADACoordinatorNYCivil-Housing@nycourts.gov>
Cc: Miss Immigrant Organization <missimmigrantusa@gmail.com>

**Dear ADA Coordinator,**

We are the Respondents in the above-referenced Housing Court matter (Index No. 307838-25/NY, Hon. Danielle Chinea, Part H).

On September 15, 2025, we filed an **Order to Show Cause in NYSCEF** seeking to clarify and modify the Court's September 3, 2025 APS referral order. That filing requests, among other relief, that any Adult Protective Services (APS) communication be limited to written or virtual contact.

In parallel, pursuant to the Americans with Disabilities Act (42 U.S.C. §12101 et seq.) and the New York Unified Court System's ADA policies, we respectfully submit this ADA Accommodation Request for administrative processing.

**Requested Accommodation:**
That any APS outreach be conducted only in writing (email or letter). If discussion is required, we request Zoom/remote conferencing rather than in-person visits or phone calls.

**Reason:**
Both Respondents suffer from documented mental health and medical conditions, which are aggravated by in-person or unannounced contact. Written and remote communication will allow us to meaningfully participate in APS assessment and court proceedings without harm to our health.

**Attachments:**

1. ADA Accommodation Request Form (completed and signed)

2. For supporting affidavits, medical documentation, and the filed OSC, we respectfully refer to the record already available in **NYSCEF under this index number**.

We respectfully ask that this request be noted on the record, coordinated with the pending OSC, and that APS be directed accordingly. Please confirm receipt of this request.

Thank you for your attention and assistance.

**Respectfully,**

/s/ Magdalena Kulisz
Magdalena Kulisz, Respondent–Tenant

/s/ Shahar Kenan
Shahar Kenan, Respondent–Tenant

209 East 83rd Street, Apt. Bsmt
New York, NY 10028
missimmigrantusa@gmail.com
(347) 435-8690

**Dated:** September 15, 2025

--

*With Love*
*Magdalena & Sha*

www.missimmigrantusa.com
C: (+1) 347 435 8690
E: MissImmigrantUSA@gmail.com
209 East 83rd Street
New York, NY 10028

*Disclaimer: One of Miss Immigrant USA initiatives is a program dedicated to empowering immigrant women to grow personally and professionally to achieve their goals and dreams. As a registered trademark, Miss Immigrant focuses on developing leadership qualities, professional skills, and community ties among participants. Our aim is to celebrate and elevate women who are proud representatives of their diverse immigrant communities, helping them become inspirational figures within and beyond those communities.*

--
Truly Yours,

Magdalena Kulisz & Sha Kenan, JD
Founders, Miss Immigrant USA

www.missimmigrantusa.com
C: (+1) 347 435 8690
E: MissImmigrantUSA@gmail.com

---

 **ADA Accommodation Request Form.pdf**
75K

# NEW YORK STATE UNIFIED COURT SYSTEM

## ADA ACCOMMODATION REQUEST FORM

**Case Name:** *Robert Lerch & Elizabeth Tapper v. Magdalena Kulisz & Shahar Kenan*
**Index No.:** LT-307838-25/NY
**Court:** Civil Court of the City of New York, Housing Part, New York County
**Judge:** Hon. Danielle Chinea
**Court Date:** October 16, 2025

**Person(s) Needing Accommodation:**

- Magdalena Kulisz
- Shahar Kenan

**Type of Disability:**

Mental health and medical conditions resulting in severe stress, panic, and difficulty with in-person interactions or unannounced contact. See Exhibit A (hospital discharge summaries and medical documentation).

**Accommodation Requested:**

That all Adult Protective Services (APS) communication with Respondents be conducted only in writing (email or letter). If discussion is required, Respondents respectfully request Zoom/remote conferencing rather than in-person meetings or home visits.

**Reason Accommodation is Needed:**

Unexpected or in-person contact would cause severe harm to Respondents' mental health, aggravating existing medical conditions and impairing their ability to participate meaningfully in APS assessment and Housing Court proceedings. Written and remote communication will enable Respondents to cooperate fully while avoiding health risks.

**Signatures:**

/s/ Magdalena Kulisz                          /s/ Shahar Kenan
 Magdalena Kulisz, Respondent-Tenant          Shahar Kenan, Respondent-Tenant



**Date:** September 15, 2025

**Contact Information:**
 209 East 83rd Street, Apt. Bsmt
 New York, NY 10028
 Email: missimmigrantusa@gmail.com
 Phone: (347) 435-8690

Ex. E



Kulisz et al v. Raga et al

**New York Southern District Court**

| | |
|---|---|
| Judge: | Laura Taylor Swain |
| Case #: | 1:25-cv-06821 |
| Nature of Suit | 440 Civil Rights - Other Civil Rights |
| Cause | 42:1983 Civil Rights Act |

Docket  |  Parties (5)

Docket last updated: 11/28/2025 11:59 PM EST

**Friday, September 05, 2025**

15  motion  Amend/Correct  Mon 09/08 5:27 PM
MOTION to RECALL TRANSFER, ACCEPT AMENDED COMPLAINT, OR ISSUE INDICATIVE RULING1 Complaint. Document filed by Shahar Kenan, Magdalena Kulisz..(yv)
Att: 1  Exhibit 1,
Att: 2  Exhibit 2

**Wednesday, September 03, 2025**

14  motion  Reconsideration  Fri 09/05 3:27 PM
PLAINTIFFS' MOTION FOR RECONSIDERATION, STAY OF TRANSFER, AND REASONABLE ACCOMMODATION. Document filed by Shahar Kenan, Magdalena Kulisz.(ar)



STANDING ORDER IN RE CASES FILED BY PRO SE PLAINTIFFS (See 24-MISC-127 Standing Order filed March 18, 2024). To ensure that all cases heard in the Southern District of New York are handled promptly and efficiently, all parties must keep the court apprised of any new contact information. It is a party's obligation to provide an address for service; service of court orders cannot be accomplished if a party does not update the court when a change of address occurs. Accordingly, all self-represented litigants are hereby ORDERED to inform the court of each change in their address or electronic contact information. Parties may[LINK:consent to electronic service] to receive notifications of court filings by email, rather than relying on regular mail delivery. Parties may also ask the court for[LINK:permission to file documents electronically] . Forms, including instructions for consenting to electronic service and requesting permission to file documents electronically, may be found by clicking on the hyperlinks in this order, or by accessing the forms on the courts website, nysd.uscourts.gov/forms. The procedures that follow apply only to cases filed by pro se litigants. If the court receives notice from the United States Postal Service that an order has been returned to the court, or otherwise receives information that the address of record for a self-represented plaintiff is no longer valid, the court may issue an Order to Show Cause why the case should not be dismissed without prejudice for failure to comply with this order. Such order will be sent to the plaintiffs last known address and will also be viewable on the court's electronic docket. A notice directing the parties' attention to this order shall be docketed (and mailed to any self-represented party that has appeared and has not consented to electronic service) upon the opening of each case or miscellaneous matter that is classified as pro se in the court's records. (Signed by Chief Judge Laura Taylor Swain on 3/18/2024) (mml)

**Wednesday, August 20, 2025**

service  Note Regarding Service on Self-Represented Party  Thu 08/21 10:40 AM
CASE MANAGEMENT NOTE: For each electronic filing made in a case involving a self-represented party who has not consented to electronic service, the filing party must serve the document on such self-represented party in a manner permitted by Fed. R. Civ. P. 5(b)(2) (other than through the ECF system) and file proof of service for each document served. Please see[LINK:Rule 9.2] of the courts ECF Rules & Instructions for further information. (mml)

**Monday, August 18, 2025**

8  service  Request for Issuance of Summons  Thu 08/21 10:38 AM
REQUEST FOR ISSUANCE OF SUMMONS as to Assembly Member Steven Raga, re:1 Complaint. Document filed by Shahar Kenan, Magdalena Kulisz. (mml)

7  motion  Permission for Electronic Case Filing  Thu 08/21 10:31 AM
MOTION FOR PERMISSION FOR ELECTRONIC CASE FILING for Magdalena Kulisz to participate in electronic case filing in this case. Document filed by Magdalena Kulisz. (mml)

6  motion  Seal  Thu 08/21 10:28 AM
MOTION TO SEAL PLAINTIFFS' ADDRESS. Document filed by Shahar Kenan, Magdalena Kulisz. (mml)

5  resporth  Affidavit in Support (non-motion)  Thu 08/21 10:25 AM
JOINT AFFIDAVIT IN SUPPORT OF APPLICATION TO PROCEED IN FORMA PAUPERIS of Magdalena Kulisz and Shahar Kenan in Support re:2 Request to Proceed In Forma Pauperis,3 Request to Proceed In Forma Pauperis. Document filed by Shahar Kenan, Magdalena Kulisz. (mml)

4  misc  Civil Cover Sheet  Thu 08/21 10:16 AM
CIVIL COVER SHEET filed. (mml)

3  misc  Request to Proceed In Forma Pauperis  Thu 08/21 10:11 AM
REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Shahar Kenan. (mml)

2  misc  Request to Proceed In Forma Pauperis  Thu 08/21 10:10 AM
REQUEST TO PROCEED IN FORMA PAUPERIS. Document filed by Magdalena Kulisz. (mml)

1  cmp  Complaint  Thu 08/21 10:05 AM
COMPLAINT against John Doe(s), Steven Raga, XYZ Organization(s) 1-10. Document filed by Magdalena Kulisz, Shahar Kenan. (mml)

utility  Case Designated ECF  Thu 08/21 10:12 AM
Case Designated ECF. (mml)

Ex. R

# New York State Unified Court System

**NYSCEF – New York State Courts Electronic Filing** (Live System)

Home
NYSCEF

Home
Unrepresented Litigants

**File Documents**

Appellate Court

Civil Court

Court of Claims

Digital Submission

Family Court

Superior Criminal Court

Supreme Court

Surrogate Court

Town & Village Court

**Cases**

My Cases

My Digital Content

Remove Consent

Surrogate Search

Case Search

**Resources**

Forms

PDF Checker

Authorized Courts

Available Documents

Rules & Legislation

## LT-307838-25/NY - New York County Civil Court - Landlord and Tenant Division

🔵 Help

NYC Housing C...
Phone: 646.386...
ny_housing_nys...

NYC Housing C

**Short Caption:** Robert Lerch et al v. Magdalena Kulisz et al

**Case Type:** Landlord and Tenant - Holdover

**eFiling Status:** **Partial Participation Recorded**

✉ **E-mail Participating Parties**

⚠ **Documents Returned for Correction**
This case has 3 documents that have been returned for correction. Click the "Refile Document" link that is located under the document.

| Document List | Case Detail |
|---|---|

**File to this Case**   📄 **Print Document List**

### Narrow By Options

| Document Type: | ⌄ | Filed By: | ⌄ |
|---|---|---|---|
| Motion Info: | ⌄ | Filed Date: | 📅 thru 📅 |
| Document #: | | | |

[ Narrow Document List ]   [ Clear ]   📁 **Show Motion Folders ONLY**

**Sort By:** Document # ⌄   [ Sort ]

| # | Document | Filed By | Status |
|---|---|---|---|
| 1 | PETITION | LITTMAN, MICHAEL HAL<br>Filed: 05/02/2025<br>*Received: 05/02/2025* | **Processed**<br>Confirmation Notice |

| | | | |
|---|---|---|---|
| 30 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE (Motion #3)<br>*Joint Affidavit* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/15/2025<br>*Received: 09/15/2025* | **Processed**<br>Confirmation Notice |
| 31 | EXHIBIT(S) - A (Motion #3)<br>*Medical Records* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/15/2025<br>*Received: 09/15/2025* | **Processed**<br>Confirmation Notice |
| 32 | EXHIBIT(S) - B (Motion #3)<br>*ADA Accommodation Request* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/15/2025<br>*Received: 09/15/2025* | **Processed**<br>Confirmation Notice |
| 33 | EXHIBIT(S) - C (Motion #3)<br>*Letter to Court* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/15/2025<br>*Received: 09/15/2025* | **Processed**<br>Confirmation Notice |
| 34 | ORDER TO SHOW CAUSE - DECLINED/WITHDRAWN | Court User<br>Filed: 09/15/2025<br>*Received: 09/15/2025* | **Processed**<br>Confirmation Notice |
| 35 | ORDER TO SHOW CAUSE ( PROPOSED ) (Motion #4)<br>*Proposed OTC* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/16/2025<br>*Received: 09/16/2025* | **Processed**<br>Confirmation Notice |
| 36 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF ORDER TO SHOW CAUSE (Motion #4)<br>*Joint Affidavit* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/16/2025<br>*Received: 09/16/2025* | **Processed**<br>Confirmation Notice |
| 37 | LETTER/CORRESPONDENCE - TO COURT<br>*COVER LETTER FOR EMERGENCY ORDER TO SHOW CAUSE* | Kulisz, Magdalena(Pro Hac / Pro Se)<br>Filed: 09/16/2025<br>*Received: 09/16/2025* | ***\*\*\* Pending \*\*\****<br>Confirmation Notice |
| 38 | ORDER TO SHOW CAUSE - DECLINED/WITHDRAWN | Court User<br>Filed: 09/16/2025<br>*Received: 09/16/2025* | **Processed**<br>Confirmation Notice |

Received: 09/16/2025

| 43 | EXPARTE ORDER (PROPOSED) (Motion #5) | Kulisz, Magdalena(Pro | Processed |
| | *Proposed Order* | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 09/16/2025 | |
| | | *Received: 09/16/2025* | |

| 44 | LETTER/CORRESPONDENCE - TO COURT | Kulisz, Magdalena(Pro | *** Pending *** |
| | *Letter to Court* | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 09/16/2025 | |
| | | *Received: 09/16/2025* | |

| 45 | LETTER/CORRESPONDENCE - TO COURT | Kulisz, Magdalena(Pro | *** Pending *** |
| | *Letter to Court* | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 09/18/2025 | |
| | | *Received: 09/18/2025* | |

| 46 | EXHIBIT(S) - A | Kulisz, Magdalena(Pro | Processed |
| | *Fee Waver approval email* | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 09/18/2025 | |
| | | *Received: 09/18/2025* | |

| 47 | EXHIBIT(S) - B | Kulisz, Magdalena(Pro | Processed |
| | *Notice of Appeal* | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 09/18/2025 | |
| | | *Received: 09/18/2025* | |

| 48 | EXHIBIT(S) - C | Kulisz, Magdalena(Pro | Processed |
| | *ADA Accommodation Request Form* | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 09/18/2025 | |
| | | *Received: 09/18/2025* | |

| 49 | DECISION/ORDER | Court User | Processed |
| | | Filed: 11/21/2025 | Confirmation Notice |
| | | *Received: 11/21/2025* | |

| 50 | NOTICE OF ENTRY | LITTMAN, MICHAEL HAL | *** Pending *** |
| | *Decision/Order and Affidaivit of Service* | Filed: 11/24/2025 | Confirmation Notice |
| | | *Received: 11/24/2025* | |

| 51 | LETTER/CORRESPONDENCE - TO COURT | Kulisz, Magdalena(Pro | *** Pending *** |
| | | Hac / Pro Se) | Confirmation Notice |
| | | Filed: 12/07/2025 | |
| | | *Received: 12/07/2025* | |

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK

# ADA ACCOMMODATION REQUEST

*(Submitted pursuant to the Americans with Disabilities Act & SDNY*
*Administrative Order § 160–170)*

**Requestors:**
 **Magdalena Kulisz**
 **Shahar Kenan**
Pro Se Plaintiffs
209 East 83rd Street
New York, NY 10028
Email: missimmigrantusa@gmail.com
Case Title: *Kulisz & Kenan v. City of New York, et al.*
Case No.: _____ (to be assigned)

## 1. NATURE OF DISABILITY (Confidential Medical Information)

**Magdalena Kulisz:**
 I suffer from severe psychiatric disabilities, trauma-related conditions, and medical impairments that substantially limit my ability to travel, appear in person, or participate in in-person court proceedings. Stress, exposure to court environments, sudden scheduling, and physical travel trigger debilitating episodes that make in-person appearance medically unsafe.

**Shahar Kenan:**
 I suffer from chronic medical conditions, mobility limitations, and psychiatric disabilities that prevent me from safely attending court in person. Physical travel, courtroom environments, and in-person interactions trigger significant medical deterioration and risk of collapse.

Both Plaintiffs experience functional limitations including:

    a.   inability to safely travel to or from the courthouse,
    b.   inability to sustain in-person hearings without medical escalation,
    c.   heightened symptoms under stress that impair cognitive and physical functioning,
    d.   significant difficulty navigating large buildings or waiting areas,

1

    e.   inability to sit or stand for prolonged periods,
    f.   medical risk associated with exposure to crowded, stressful environments.

These impairments substantially limit major life activities including walking, concentrating, communicating, and handling major bodily functions.

## 2. DESCRIPTION OF ACCOMMODATIONS REQUESTED

Pursuant to ADA Title II, Judicial Conference ADA Guidance, and SDNY ADA Procedures, Plaintiffs respectfully request:

### A. Remote Appearance Accommodation (Primary Request)

Permission to attend all conferences, hearings, and proceedings in this case by remote/virtual means (Zoom or telephone).

This includes:

    a.   Emergency TRO proceedings
    b.   Preliminary injunction hearing
    c.   Scheduling conferences
    d.   Status conferences
    e.   Any oral argument
    f.   Any settlement or mediation session

### B. Electronic Filing, Service, and Communication

Permission for:

    a.   Electronic service of all documents
    b.   Email communication from the Court
    c.   Electronic submission of any filings normally requiring in-person delivery

### C. Flexible Deadlines Related to Medical Episodes

A reasonable accommodation allowing **extension requests** when medical deterioration prevents filing on time.

### D. Alternative "written appearance" in extreme medical episodes

If Plaintiffs experience disabling episodes, the Court should treat a written filing or letter as satisfying the appearance obligation for that date.

These accommodations do not seek legal advantage—only equal access.

## 3. NEXUS BETWEEN DISABILITY & REQUESTED ACCOMMODATIONS

The requested accommodations are medically necessary because:

a. Plaintiffs' disabilities make physical court attendance unsafe and impossible at unpredictable times.
b. Travel can trigger severe medical/psychiatric episodes, including panic, collapse, or disorientation.
c. Plaintiffs cannot reliably predict when symptoms occur; therefore remote access is the only safe method of participation.
d. The inability to safely appear in person has already resulted in defaults, inquests, and eviction actions in Housing Court—harm this Court can now prevent.
e. Without these accommodations, Plaintiffs cannot meaningfully participate in this federal case, violating *Tennessee v. Lane*, 541 U.S. 509 (2004).

Remote appearance is a reasonable modification under ADA Title II, routinely granted by SDNY for disabled litigants.

## 4. ACCOMMODATIONS WILL NOT ALTER THE NATURE OF THE PROCEEDINGS

Remote access:

a. does not prejudice defendants,
b. does not interfere with judicial control,
c. is routinely used in SDNY,
d. preserves court resources, and
e. allows disabled litigants meaningful access to justice.

The requested modification does not fundamentally alter the nature of proceedings and is mandated under ADA Title II, 28 C.F.R. § 35.130.

## 5. REQUEST FOR CONFIDENTIAL HANDLING OF MEDICAL INFORMATION

Plaintiffs respectfully request that:

a. All medical documentation be treated as confidential,
b. Not placed on the public docket,
c. Reviewed only by the ADA Coordinator or Judge as permitted.

Supporting medical summaries can be submitted under seal or emailed privately to the ADA Coordinator upon request.

## 6. PRIOR DENIALS OF ADA ACCOMMODATIONS SUPPORT THE NEED FOR SDNY RELIEF

Plaintiffs note that in Housing Court:

  a. ADA requests were ignored,
  b. No written decisions were issued,
  c. Disability-based inability to appear was treated as default,
  d. Inquest and eviction warrant were issued without accommodation.

To ensure full compliance with federal law, we respectfully request that SDNY proactively grant the accommodations above.

## 7. SIGNATURES

We request these ADA accommodations in good faith and certify that they are necessary for meaningful access to this court.

Executed on December 11, 2025
 New York, New York

**MAGDALENA KULISZ**
Pro Se Plaintiff

**SHAHAR KENAN**
Pro Se Plaintiff

Email: missimmigrantusa@gmail.com

4